**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JAMES DINKINS, a/k/a Miami,

*Defendant-Appellant.*

No. 09-4668

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

MELVIN GILBERT,

*Defendant-Appellant.*

No. 09-4669

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

DARRON GOODS, a/k/a Moo Man,

*Defendant-Appellant.*

No. 09-4755

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, Senior District Judge.
(1:06-cr-00309-JFM-1; 1:06-cr-00309-JFM-5;
1:06-cr-00309-JFM-9)

Argued: March 22, 2012

Decided: August 14, 2012

Before SHEDD, KEENAN, and FLOYD, Circuit Judges.

---

Affirmed by published opinion. Judge Keenan wrote the opinion, in which Judge Shedd and Judge Floyd joined.

---

## COUNSEL

**ARGUED:** Gary Proctor, LAW OFFICES OF GARY E. PROCTOR, LLC, Baltimore, Maryland; Jonathan Paul Van Hoven, Baltimore, Maryland; C. Justin Brown, LAW OFFICE OF C. JUSTIN BROWN, Baltimore, Maryland, for Appellants. Debra Lynn Dwyer, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** Rod J. Rosenstein, United States Attorney, Joan Mathias, Law Clerk, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

---

## OPINION

BARBARA MILANO KEENAN, Circuit Judge:

In this appeal, we review the convictions of three defendants who were tried together on charges relating to the murder of certain government witnesses, the murder of a co-conspirator, and numerous other narcotics and firearms-related offenses arising from the defendants' involvement in a drug-trafficking organization in Baltimore. Among the several issues presented, we consider the primary issues of: (1) the district court's decision to empanel an "anonymous jury,"

in which biographical information about prospective jurors was withheld from the parties and their counsel; and (2) the admissibility of hearsay statements of a murdered government witness under the "forfeiture-by-wrongdoing" exception to the hearsay rule and the Confrontation Clause. We conclude that the district court did not abuse its discretion in maintaining juror anonymity, and that the challenged hearsay statements were admissible based on the defendants' conduct leading to the witness' death. Upon our review of these primary issues, and the remaining issues presented, we affirm the district court's judgment.

## I.

We begin by setting forth the general factual background of the case, based on the evidence presented at trial. Additional relevant facts are included in later sections of this opinion as necessary for our consideration of the issues raised on appeal.

In 2003, the Baltimore City Police Department conducted an investigation of a local organization commonly known as "Special," whose members were suspected of distributing large amounts of narcotics in the Bartlett neighborhood of Baltimore.[1] The investigation revealed that members of Special regularly distributed heroin, cocaine, cocaine base, and marijuana, and committed numerous acts of violence in furtherance of their narcotics activities. One member of Special stated that each day he sold tens of thousands of dollars of heroin and cocaine.

Melvin Gilbert was the "leader" of Special, who received and controlled the proceeds derived from Special's narcotics operation. James Dinkins was a member of Special who served as an "enforcer," committing murders "for hire." Dar-

---

[1]The word "Special" also is a reference to the street name of the heroin that was sold by this organization.

ron Goods, also a member of Special, sold drugs for the organization. These three men are the defendants in this case.

Gilbert had several "lieutenants" who helped him conduct Special's operations, including Tracy Love, Tamall Parker, and Randy McLean. Additionally, several other individuals were members of Special, or otherwise "worked with" the group, including Michael Bryant, Damien West, John Dowery (Dowery), Dowery's son Cecil Dowery, and Cornell Booker.

Based on months of surveillance and investigation, the police learned that Gilbert planned to arrive in the Bartlett neighborhood on October 16, 2003, with a large amount of narcotics. In anticipation of this delivery, the police obtained search warrants for three houses located on Bartlett Avenue that were suspected of containing narcotics. Gilbert's grandmother owned one of these houses.

On October 16, 2003, the officers saw Gilbert drive into the neighborhood and park his car in front of his grandmother's house. He was observed carrying a grey bag into one of the other two houses before he returned outside, met with several individuals, and pointed them toward the house he had entered. Past police surveillance had indicated that narcotics were kept in that house. One of the individuals with whom Gilbert spoke entered the house, brought out a package, and engaged in hand-to-hand movements that were indicative of a drug transaction. At that time, several officers emerged from covert locations and arrested the various suspects, including Gilbert and McLean. Dinkins and Goods were not among the individuals arrested at that time.

The officers proceeded to execute the search warrants for the three houses. Upon searching the houses, the officers seized about 800 vials of white powder that tested positive for cocaine, 700 capsules of powder that tested positive for heroin, a quantity of marijuana, several firearms including a 9mm machine pistol and a .357 magnum revolver, boxes of

ammunition, and thousands of dollars in United States currency.

The grey bag that Gilbert was observed carrying into one of the houses contained 525 capsules of heroin. While no narcotics or guns were found in Gilbert's grandmother's house, on Gilbert's person, or in his automobile, the authorities seized over $700 in currency in an envelope found in Gilbert's grandmother's house.

After his arrest in October 2003, Gilbert remained incarcerated until July 2005. Shortly after he was released, Gilbert was introduced to Frank Batts, the leader of "24/7," another large drug organization operating in Baltimore. Over the next year, Batts purchased "wholesale" quantities of heroin from Gilbert and other members of Special on about fifteen occasions, in amounts that ranged between one-fifth of a kilogram and one-half of a kilogram.

On one occasion, Gilbert told Batts that Shannon Jemmison, an individual who lived in the neighborhood where 24/7 operated, was a government informant, or a "snitch." It was widely believed that Jemmison had cooperated with law enforcement officers regarding the operations of yet another large drug organization, led by the "Rice Brothers."

Batts knew that Gilbert did not "like" snitches, and Gilbert earlier had told him "about a snitch that he was trying to get." After Gilbert asked whether Batts would "want to get" Jemmison, Batts responded affirmatively. Gilbert later introduced Batts to Dinkins, who agreed to kill Jemmison in exchange for several thousand dollars. Gilbert consented to bearing the initial cost of paying Dinkins, subject to Batts' agreement to reimburse Gilbert in their next drug transaction.

On September 10, 2005, Batts drove Dinkins to a trailer where Jemmison was playing cards. At that location, Dinkins shot Jemmison several times at point-blank range, killing him.

After Batts heard the shots, he moved to a designated location where he met Dinkins and drove him to another neighborhood. That evening, Batts paid Dinkins $4,000, which was about half his "fee" for killing Jemmison.[2]

In October 2004, James Wise, a drug dealer not affiliated with Special, was murdered on a street corner during daylight hours after he had robbed a member of Special. John Dowery, a drug dealer who sold drugs as a member of Special, was a witness to the murder.

Dowery contacted certain law enforcement officers and provided them information about the Wise murder. Dowery also began sharing with the officers information concerning other investigations in the Bartlett neighborhood, including information about the organizational structure and operations of Special. Parker and Love, who were both "high-ranking" members of Special, were arrested after Dowery provided incriminating information concerning them. After their arrest, Dowery became widely known as a "snitch."

Before Dowery could testify at the upcoming state murder trial of Parker and Love, on October 19, 2005, Dinkins told West, another drug dealer who was a member of Special, that they had been "nominated to kill" Dowery. That day, Dinkins and West arrived at Dowery's house and waited outside for him to return from work. When Dowery arrived, Dinkins and West fired more than a dozen shots at Dowery, striking him multiple times. After Dinkins later learned that Dowery did not die from his injuries, Dinkins stated to West: "We have to go to the hospital to finish him off."[3]

---

[2]At the time of trial in the present case, Batts had pleaded guilty to possession with intent to distribute between one and three kilograms of heroin, but he had not yet been sentenced for that offense.

[3]At that time, however, Dinkins and West did not further pursue this plan.

Dowery eventually recovered from his gunshot wounds. He spoke with detectives after the shooting, and identified Dinkins from a photo array as the individual who had shot him.[4]

Michael Bryant, a member of Special, had given Dinkins the name of an individual who agreed to provide new firearms in exchange for the guns used to shoot Dowery. On November 10, 2005, Dinkins, West, and Bryant met to complete this transaction. After problems arose that prevented them from completing this transaction, Dinkins shot Bryant, killing him.

Love offered an additional explanation at trial for Dinkins' decision to kill Bryant, a co-conspirator and fellow member of Special. According to Love, Bryant was upset that Dinkins had attempted to kill Dowery, because Bryant thought this attempt would cause more "trouble" for Love and Parker at their upcoming trial. Love testified that Dinkins murdered Bryant because of Bryant's "fussing" about the attempt on Dowery's life. Love stated that Dinkins "lure[d] [Bryant] out of the house and they drove to [ ] a dark area," where Dinkins "pistol-whipped" Bryant in the head, and then shot Bryant twice. Dinkins was arrested on December 9, 2005, and has remained incarcerated since that date.

In January 2006, Dowery testified in the state trial of Parker and Love.[5] After the attempt on Dowery's life in October 2005, measures were taken to protect him as a witness, and he was relocated for his safety outside the Bartlett neighborhood. However, even with these measures in place, Dowery received a message from Gilbert through Dowery's son Cecil, also a member of Special, in which Gilbert threatened: "I know where you are at. I know where you walk your girl to

---

[4]West ultimately pleaded guilty for his role in the attempted murder of Dowery in October 2005.

[5]Parker and Love also were charged in the indictment in the present federal case. They each entered guilty pleas to one count related to the murder of Wise, and to one count of conspiring to distribute narcotics.

the bus stop. I can get you out there. Don't come around here." Recognizing that Dowery's safety had been compromised, Baltimore City Police Department Detective Michael Baier began arranging for Dowery and his family to be moved.

Despite Gilbert's warning and against the advice of Detective Baier, Dowery decided to return home to Bartlett for Thanksgiving Day, 2006. As explained later in this opinion, Gilbert and Goods shot Dowery several times on Thanksgiving Day, and Dowery died from those wounds.

Other testimony presented at trial provided additional context for the violent acts described above. Love testified that he and Dinkins spoke about several of the incidents related above during the time that they were incarcerated in the same jail. Regarding the Jemmison murder, Love testified that Dinkins admitted in jail that he had killed Jemmison by shooting him "six times in the face." Dinkins also reportedly told Love that he was paid $4,000 by Batts to kill Jemmison "for somebody that was in the Rice [Brothers] case."

Batts' lengthy trial testimony concerning the Jemmison murder was substantially similar to Love's testimony. Batts testified concerning his coordination with Dinkins and Gilbert in the plan to murder Jemmison. Batts also confirmed that he had paid Dinkins $4,000 to have Jemmison killed.

Regarding the attempt on Dowery's life in 2005, Love testified that he also talked with Dinkins in jail about that subject. According to Love, Dinkins admitted that he had "shot [Dowery] and he was sorry that he didn't kill him."

## II.

On the basis of these facts and other evidence in the record, a grand jury charged Dinkins, Gilbert, and Goods (collectively, the defendants), as well as Love, Parker, and McLean,

in a twelve-count indictment. The predominating count of the indictment was the charge of conspiracy to distribute narcotics, resulting from the defendants' involvement with Special, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), (b)(1)(C), 846.

Based on the October 2003 seizure of narcotics and firearms, the indictment charged Gilbert with: distribution of heroin and cocaine, in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1), (b)(1)(C); and possession of a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. §§ 2, 924(c)(1)(A)(i). The indictment also charged Dinkins and Gilbert with several counts relating to the murder of Jemmison: murder with intent to prevent the attendance and testimony of a person in an official proceeding, and to prevent the communication of information regarding a federal offense to law enforcement, in violation of 18 U.S.C. §§ 2, 1512(a)(1)(A), 1512(a)(1)(C); use of a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. §§ 2, 924(c)(1)(A)(iii); and willfully causing the death of a person by using a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. §§ 2, 924(j).

With respect to the attempted murder of Dowery, the indictment charged Dinkins with the use of a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. §§ 2, 924(c)(1)(A)(iii). The indictment also charged Dinkins with several counts relating to the Bryant murder: use of a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. §§ 2, 924(c)(1)(A)(iii); and willfully causing the death of a person by using a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. §§ 2, 924(j).

Lastly, regarding the Dowery murder, the indictment charged Gilbert and Goods with several crimes. Those crimes included: murder with intent to prevent the attendance and testimony of a person in an official proceeding, and to prevent the communication of information regarding a federal offense

to law enforcement, in violation of 18 U.S.C. §§ 2, 1512(a)(1)(A), 1512(a)(1)(C); use of a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. §§ 2, 924(c)(1)(A)(iii); and willfully causing the death of a person by using a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. §§ 2, 924(j).

In pre-trial proceedings, the government filed a motion requesting that the defendants be tried jointly. The district court granted the motion, finding that a joint trial would be more efficient than separate trials. The court later denied a motion filed by Goods seeking severance of the charges against him.

As the date of jury selection approached, the district court inquired whether any party requested an anonymous jury. Due to concerns about juror safety and media attention, the government supported the measure. The defendants objected, arguing that an anonymous jury would impede effective voir dire, and would infringe the presumption of innocence because jurors would think that they required protection from the defendants.

The district court concluded that certain biographical information about the jurors should not be disclosed to the parties or to their counsel, because the case involved the murder of government witnesses. As a result, the names of the venire members and their spouses, the venire members' employers and those of their spouses, and the addresses of the venire members, were not disclosed to the parties or to their counsel. However, the juror questionnaires provided extensive information for counsel's use during voir dire, including information regarding the general location of the venire members' residences and the type of employment of the venire members and their spouses.

During voir dire, the defendants made an objection pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986), based on the

government's use of a peremptory challenge to strike an African-American female member of the venire. The defendants asserted that the government had not established a race-neutral justification for its peremptory challenge and, therefore, that the offered explanation was mere pretext. The district court concluded that the government offered several race-neutral reasons to support its decision to strike the venire member, and overruled the objection. Shortly thereafter, the jury was empaneled and the trial began.

On several occasions during trial, the government argued that certain hearsay statements made by Dowery were admissible under the forfeiture-by-wrongdoing exception to the hearsay rule and the Confrontation Clause. The government argued that this exception was applicable because Dinkins and Gilbert, or their co-conspirators, succeeded in rendering Dowery unavailable as a witness.

The Dowery hearsay statements were highly relevant to the government's theory of the case. Those statements principally included: 1) a description of Special's members and operations; 2) an identification of Dinkins as one of the men who shot Dowery in October 2005; and 3) the threatening message Dowery received from Gilbert after witness-relocation measures were taken to protect Dowery.

Dinkins and Gilbert objected to the admission of the hearsay statements. Goods, however, agreed with the government that the statements regarding Special's members and operations should be admitted, because Dowery had not named him as a member of Special in his written statements to investigators. The district court ruled that the statements were admissible.

After a twelve-day trial, the jury returned a verdict of guilty against Dinkins, Gilbert, and Goods, on all counts but one.[6]

---

[6]The jury found Gilbert not guilty of willfully causing the death of Jemmison by using a firearm in furtherance of a drug-trafficking crime. How-

Each of the defendants was sentenced to life imprisonment on multiple counts. The defendants timely filed notices of appeal.

III.

The defendants argue that the district court abused its discretion in refusing to order separate trials. The defendants assert that they suffered prejudice resulting from the joint trial for three reasons: (1) the jury was presented with evidence of multiple murders, akin to a "blizzard of violence," even though each murder was not attributable to every defendant; (2) a defendant, such as Goods, who was not subject to receiving the death penalty (non-capital defendant), should not have had his case joined for trial with defendants Dinkins and Gilbert who were facing the possible imposition of that penalty (capital defendants); and (3) Goods presented a defense that was mutually antagonistic to the defenses presented by Dinkins and Gilbert. We conclude that the defendants' arguments are without merit.

A district court's denial of a motion to sever is reviewed for abuse of discretion. *United States v. Allen*, 491 F.3d 178, 189 (4th Cir. 2007). Under Rule 8(b) of the Federal Rules of Criminal Procedure, an indictment

> may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

ever, the jury found Gilbert guilty of the Jemmison murder based upon the theories of liability in two other counts: murder with intent to prevent the attendance and testimony of a person in an official proceeding, and to prevent the communication of information regarding a federal offense to law enforcement; and use of a firearm in furtherance of a drug-trafficking crime.

However, if joinder of offenses or defendants "appears to prejudice" any party, the court may order separate trials. Fed. R. Crim. P. 14(a).

We adhere to the general principle that when defendants are indicted together, they should be tried together. *United States v. Singh*, 518 F.3d 236, 255 (4th Cir. 2008) (citing *United States v. Strickland*, 245 F.3d 368, 384 (4th Cir. 2001)). Joint trials are more efficient, and "generally serve the interests of justice by avoiding the . . . inequity of inconsistent verdicts." *Richardson v. Marsh*, 481 U.S. 200, 210 (1987). Therefore, when an indictment properly has joined two or more defendants under the provisions of Rule 8(b), severance pursuant to Rule 14 is rarely granted. *Cf. United States v. Hornsby*, 666 F.3d 296, 309 (4th Cir. 2012) (When offenses "are properly joined under Rule 8(a), severance of the offenses is rare.").

Under these circumstances, severance generally is granted only when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). We will not reverse a denial of a motion to sever absent a showing of clear prejudice. *See Hornsby*, 666 F.3d at 309; *see also United States v. Casteel*, 663 F.3d 1013, 1018 (8th Cir. 2011) (clear prejudice must be shown to reverse denial of motion to sever codefendants' trial); *United States v. Thompson*, 518 F.3d 832, 863 (10th Cir. 2008) (same).

The defendants first argue that they were prejudiced by joint trials because they were forced to defend themselves against a body of evidence that included separate murders not attributable to all defendants. The indictment charged Dinkins with murdering Michael Bryant, Dinkins and Gilbert with murdering Shannon Jemmison, and Gilbert and Goods with murdering John Dowery.

We conclude that severance was not required on this basis. "[J]oinder is highly favored in conspiracy cases, over and above the general disposition [supporting] joinder for reasons of efficiency and judicial economy." *United States v. Tedder*, 801 F.2d 1437, 1450 (4th Cir. 1986). Here, the defendants and others were charged with participating in a conspiracy to distribute large quantities of narcotics as members of Special. Significantly, each defendant in the present case was charged with a murder in furtherance of that conspiracy, charges which are supported by the record. Thus, we are not confronted with a case in which defendants were "tried together in a complex case and they [had] *markedly different degrees of culpability*," *Zafiro*, 506 U.S. at 539 (emphasis added). Moreover, any risk of prejudice that may have existed was minimized by measures less drastic than severance, including limiting instructions given by the district court when certain evidence was admitted against one or more, but not all, defendants. *See United States v. Hayden*, 85 F.3d 153, 160 (4th Cir. 1996). Therefore, the defendants have not proved clear prejudice on this basis.

Next, Goods separately argues that, as a non-capital defendant, he should have been afforded a trial separate from that of the capital defendants, Dinkins and Gilbert, because a non-capital defendant runs a risk of prejudice from being tried jointly with capital defendants. Goods suggests that this risk of prejudice stems from the exclusion of sympathetic jurors from a "death-qualified" jury.

The Supreme Court, however, has rejected this same argument, holding that a non-capital defendant "could not demonstrate that being tried by a death-qualified jury violated either his right to a jury selected from a fair cross section of the community or his right to an impartial jury." *See United States v. Lighty*, 616 F.3d 321, 351 (4th Cir. 2010) (discussing *Buchanan v. Kentucky*, 483 U.S. 402, 415-20 (1987)). Because Goods has not distinguished the present case from

the holding in *Buchanan*, his argument is foreclosed by that decision.

The defendants argue, nevertheless, that they suffered clear prejudice because Goods' position was antagonistic to that of Dinkins and Gilbert, in that Goods joined the government in seeking admission of the Dowery hearsay statements. Goods sought the admission of this evidence to show that Dowery had the opportunity to identify Goods as a member of Special, and did not do so, which allegedly tended to show that he was not involved in the conspiracy or other charged criminal conduct.

Although Dinkins and Gilbert opposed the introduction of the Dowery statements, mutually antagonistic defenses are not necessarily prejudicial. *Zafiro*, 506 U.S. at 538. Hostility among defendants, and even a defendant's desire to exculpate himself by inculpating others, do not of themselves qualify as sufficient grounds to require separate trials. *United States v. Najjar*, 300 F.3d 466, 474 (4th Cir. 2002) (citing *United States v. Spitler*, 800 F.2d 1267, 1271 (4th Cir. 1986)). Instead, "[t]here must be such a stark contrast presented by the defenses that the jury is presented with the proposition that to believe the core of one defense it must disbelieve the core of the other, or that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty." *Najjar*, 300 F.3d at 474 (internal quotation marks and citations omitted). The defendants here have not shown clear prejudice, because the jury was not presented with a "stark contrast" such that believing Goods' defense would result in disbelief of the defense offered by Dinkins and Gilbert. Accordingly, we conclude that the district court did not abuse its discretion in denying the severance motion.

## IV.

The defendants next argue that the district court committed reversible error in deciding to empanel an anonymous jury.

The defendants assert that the district court's action was a "drastic" measure, one warranted only when the record shows that a defendant retains the capacity to harm or influence jurors and likely will undertake this course of action. According to the defendants, there was no evidence before the district court to support such a finding.

The issue whether a defendant in a criminal case may be tried by an anonymous jury has been raised only in recent decades, and initially was considered by a federal court of appeals in *United States v. Barnes*, 604 F.2d 121 (2d Cir. 1979). In the decades following *Barnes*, federal courts have increasingly used anonymous juries on a limited basis in certain types of criminal cases.[7]

The issue of the circumstances under which a district court may empanel an anonymous jury presents a matter of first impression in this Circuit.[8] In examining this issue, we will begin by considering the applicable standard of appellate review. We next will consider precedent from our sister circuits and discuss the requirements for empaneling an anonymous jury. In making this assessment, we also will consider the distinction between the decision to empanel an anonymous jury in capital cases and a like decision made in noncapital cases. After reviewing the present record involving both classes of offenses, we will consider whether the district court's decision was supported by the record and whether the district court took sufficient precautions to safeguard the defendants' constitutional rights.

---

[7]*See* Adam Liptak, *Nameless Juries Are on the Rise In Crime Cases*, N.Y. Times, Nov. 18, 2002, at A1 (noting that about 30 judicial decisions discussed anonymous juries in the decade after *Barnes*, while about 180 additional judicial decisions discussed the practice in the next dozen years).

[8]In one unpublished case, we briefly addressed a court's decision to empanel an anonymous jury, in the context of our review of a *Batson* challenge. *See United States v. Williamston*, No. 91-5163, 1993 WL 527977 (4th Cir. Dec. 21, 1993) (unpublished).

## A.

The district court reached its conclusion that an anonymous jury was necessary after reviewing the proposed juror questionnaire. During this review, the district court inquired whether either party was requesting an anonymous jury.[9] The government argued in favor of having an anonymous jury seated, while the defendants objected to the measure.

After hearing argument on the matter, the district court stated that the only issue ripe for decision was whether the juror questionnaire would be sent to the venire members in a form that protected their anonymity. The district court addressed that issue, stating:

> [T]he bottom line on this, whatever it takes, certainly I am prepared to bite the bullet on this. This is a case involving the murder of a witness. I understand. I've read the memorandum that the witness is in jail, and the question is organization. . . . But be that as it may, I'm not going to fool around. We have citizens being brought in here who have legitimate concerns. As far as I'm concerned, the odds are that I'm going to ultimately rule that the jury should be anonymous.

Based on these concerns, and what the court described as the "incredibly intrusive" nature of the questions, the district court determined that the juror questionnaire would be sent in a form that protected juror anonymity.

The jury questionnaire that ultimately was approved did not

---

[9]The district court's inquiry apparently was prompted by a question from the jury commissioner, who asked whether the personal information of the venire members should be withheld from counsel in the present case, because such information had been withheld in an unrelated capital murder trial, *United States v. Byers*, 603 F. Supp. 2d 826 (D. Md. 2009), that was simultaneously proceeding in federal district court in Maryland.

provide counsel with the names of the venire members or the names of their employers. In lieu of providing the full addresses of the venire members, the questionnaire included the neighborhood, county, and "zip code" in which they resided. The questionnaire also did not provide the names of the spouses of the venire members, or identify their spouses' employers.

Counsel for Gilbert asked that the district court instruct the jurors ultimately chosen that any anonymous status was intended to protect them from unwanted media attention. The district court and the government agreed that such an instruction would be appropriate if an anonymous jury were empaneled.

About two months after that pre-trial hearing, on the day voir dire began, the district court addressed the issue whether the jury would remain anonymous. The district court decided that it would continue to limit the information provided to the parties "because of a finding that to give more information may jeopardize the life or safety of those persons."[10]

To date, counsel for the government and for the defendants do not know the names of the jurors, or their addresses. Also, counsel do not know the names of the jurors' spouses, or the employers of either the jurors or their spouses.

---

[10]Counsel for Dinkins stated at this time that while he thought the record was "abundantly clear," he wanted to preserve his objection to the district court's decision to withhold the names and addresses of the venire members. The district court responded, "Absolutely. Absolutely you have an exception." The record therefore refutes the government's contention, repeated at oral argument, that after the initial pre-trial conference, "[n]o further objection was raised by the defendants to the anonymity of the jury."

B.

In deciding the appropriate standard of review, we begin by observing that every federal appeals court to have considered this issue has held that a district court's decision to empanel an anonymous jury is reviewed under a deferential abuse-of-discretion standard. *United States v. DeLuca*, 137 F.3d 24, 31 (1st Cir. 1998); *United States v. Stewart*, 590 F.3d 93, 124 (2d Cir. 2009); *United States v. Thornton*, 1 F.3d 149, 154 (3d Cir. 1993); *United States v. Brown*, 303 F.3d 582, 601 (5th Cir. 2002); *United States v. Lawson*, 535 F.3d 434, 439 (6th Cir. 2008); *United States v. Benabe*, 654 F.3d 753, 760 (7th Cir. 2011); *United States v. Darden*, 70 F.3d 1507, 1532 (8th Cir. 1995); *United States v. Shryock*, 342 F.3d 948, 970 (9th Cir. 2003); *United States v. Ross*, 33 F.3d 1507, 1519 (11th Cir. 1994); *United States v. Moore*, 651 F.3d 30, 48 (D.C. Cir. 2011). We conclude that use of this standard is appropriate, because the decision to empanel an anonymous jury requires a fact-based assessment of the likely course of trial proceedings, the environment surrounding the trial, and the question whether publicity or security concerns could jeopardize the jury's ability to discharge its duty. *See United States v. Childress*, 53 F.3d 693, 702 (D.C. Cir. 1995). Thus, we join our sister circuits in holding that a district court's decision whether to empanel an anonymous jury is reviewable for abuse of discretion.

C.

We turn now to address the standards governing a district court's decision whether to empanel an anonymous jury in capital and non-capital cases. We also discuss the type of information that a court may rely upon in reaching this decision.

The term "anonymous jury" does not have one fixed meaning. A jury generally is considered to be "anonymous" when a trial court has withheld certain biographical information

about the jurors either from the public, or the parties, or both. *See United States v. Branch*, 91 F.3d 699, 723 (5th Cir. 1996). A lesser degree of anonymity may entail disclosing to the parties the names of the venire members, but identifying them only by number in open court. Greater degrees of anonymity may involve withholding from the parties the names, addresses, employers, and certain other biographical information about the venire members or their spouses. *See United States v. Honken*, 378 F. Supp. 2d 880, 919-21 (N.D. Iowa 2004). A district court's decision to empanel an anonymous jury should reflect the court's consideration of the various types of information that warrant being withheld.

A federal district court may empanel an anonymous jury in any non-capital case in which "the interests of justice so require." 28 U.S.C. § 1863(b)(7); *see also United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1033 n.24 (11th Cir. 2005) (citing Section 1863(b)(7) as statutory authority for decision to empanel an anonymous jury, in a non-capital case); *United States v. Marrero-Ortiz*, 160 F.3d 768, 776 (1st Cir. 1998) (same). Although not defined in Section 1863(b)(7), the "interests of justice" standard "contemplates a peculiarly context-specific inquiry," *Martel v. Clair*, 132 S. Ct. 1276, 1287 (2012). By contrast, in capital cases, the district court may only empanel an anonymous jury after determining, "by a preponderance of the evidence that providing the list [of the members of the venire and their places of abode] may jeopardize the life or safety of any person." 18 U.S.C. § 3432 (Section 3432).

We draw upon persuasive precedent from our sister circuits, which already have developed principles guiding the empanelment of anonymous juries, in our resolution of this context-specific inquiry. The decision to empanel an anonymous jury and to withhold from the parties biographical information about the venire members is, in any case, "an unusual measure," *Shryock*, 342 F.3d at 971, which must be plainly warranted by the particular situation presented. *See United*

*States v. Vario*, 943 F.2d 236, 239 (2d Cir. 1991). An anonymous jury is warranted only when there is strong reason to conclude that the jury needs protection from interference or harm, or that the integrity of the jury's function will be compromised if the jury does not remain anonymous. *See Shryock*, 342 F.3d at 971 (citing *DeLuca*, 137 F.3d at 31).

Even when such exceptional circumstances are present, the decision to empanel an anonymous jury nevertheless may affect a defendant's constitutional right to a presumption of innocence by raising in the minds of the jurors a suggestion that "the defendant is a dangerous person from whom the jurors must be protected." *Ross*, 33 F.3d at 1519; *see also Lawson*, 535 F.3d at 441 (there may be instances when empaneling an anonymous jury may "jeopardize constitutional rights - such as the right to a presumption of innocence"). Further, a court's action withholding certain biographical information from the parties may affect a defendant's constitutional right to trial by an impartial jury, by hindering the defendant's ability to conduct an informed voir dire examination and to challenge effectively the seating of individual jurors. *Benabe*, 654 F.3d at 760 (citing *United States v. Mansoori*, 304 F.3d 635, 650 (7th Cir. 2002)). Accordingly, we hold that a district court may empanel an anonymous jury only in rare circumstances when two conditions are met: (1) there is strong reason to conclude that the jury needs protection from interference or harm, or that the integrity of the jury's function will be compromised absent anonymity; and (2) reasonable safeguards have been adopted to minimize the risk that the rights of the accused will be infringed. *See Ochoa-Vasquez*, 428 F.3d at 1034 (citing *Ross*, 33 F.3d at 1520); *Shryock*, 342 F.3d at 971 (citing *DeLuca*, 137 F.3d at 31); *see also Mansoori*, 304 F.3d at 650 (a court deciding whether to empanel an anonymous jury must balance the defendant's rights against the jurors' interest in their security and the public interest in an impartial jury).

Courts have identified five factors, occasionally referred to as "the *Ross* factors," which we find helpful in determining

whether there are strong reasons supporting the empaneling of an anonymous jury. *Ross*, 33 F.3d at 1520. Those factors are:

> (1) the defendant's involvement in organized crime, (2) the defendant's participation in a group with the capacity to harm jurors, (3) the defendant's past attempts to interfere with the judicial process, (4) the potential that, if convicted, the defendant will suffer a lengthy incarceration and substantial monetary penalties, and (5) extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation or harassment.

*Id.*; *see also Moore*, 651 F.3d at 48 (same); *Ochoa-Vasquez*, 428 F.3d at 1034 (same); *Shryock*, 342 F.3d at 971 (same); *DeLuca*, 137 F.3d at 31-32 (same). However, this list of factors is not exhaustive, nor does the presence of any one factor or set of factors automatically compel a court to empanel an anonymous jury. While we view the *Ross* factors as instructive in our analysis because they are drawn from significant judicial experience addressing the propriety of decisions whether to order anonymous juries, we emphasize that a district court must always engage in a context-specific inquiry based upon the facts of the particular case before the court. *See Martel*, 132 S. Ct. at 1287.

An anonymous jury only may be ordered in capital cases in a narrower set of circumstances permitted by statute. Under Section 3432,

> [a] person charged with treason or other capital offense shall at least three entire days before commencement of trial . . . be furnished with a copy of the indictment and a list of the veniremen, and of the witnesses to be produced on the trial for proving the indictment, stating the place of abode of each venireman and witness, *except that such list of the venire-*

*men and witnesses need not be furnished if the court*
*finds by a preponderance of the evidence that pro-*
*viding the list may jeopardize the life or safety of any*
*person.*

(Emphasis added).

In conducting our review, we observe that the *Ross* factors
are relevant to cases involving capital, as well as non-capital,
offenses to the extent that those factors shed light on the issue
whether an anonymous jury is required to protect "the life or
safety of any person."[11] 18 U.S.C. § 3432. In a capital case,
however, such as the trial involving Dinkins and Gilbert, the
record must support a finding "*by a preponderance of the evi-*
*dence* that providing the list [of the venire members and their
places of abode] may [have] jeopardize[d] the life or safety of
any person." *Id.* (emphasis added). Thus, the plain language
of Section 3432 requires that a district court base its decision
to empanel an anonymous jury on evidence that was in the
record at the time of the district court's ruling.

A district court may not rely solely on the indictment to
support its decision to empanel an anonymous jury under Sec-
tion 3432, because an indictment is not evidence. *See United*
*States v. Udeozor*, 515 F.3d 260, 272 (4th Cir. 2008) (citing
*Taylor v. Kentucky*, 436 U.S. 478 (1978)). Although an indict-
ment may inform a district court's understanding of the case,
the language of Section 3432 requires that a decision to
empanel an anonymous jury be supported by a preponderance
of the evidence. Thus, a decision to empanel an anonymous

---

[11]The parties do not contest the proposition that a district court's deci-
sion to empanel an anonymous jury in a capital case may be justified with
reference to the non-exhaustive factors identified in *Ross*, provided that
the requirements of Section 3432 are met. With regard to defendants
charged only with non-capital offenses, we do not apply the standard
stated in Section 3432 because, by its plain terms, that section applies only
to capital cases.

jury in a capital case without evidence meeting this standard constitutes an abuse of discretion.[12]

By contrast, in non-capital cases, the district court's decision need not have been based on evidence already in the record at the time the decision was made, and may be upheld on appeal in light of the evidence ultimately presented at trial. *See Shryock*, 342 F.3d at 971-72 (considering "all relevant evidence introduced at trial"); *United States v. Krout*, 66 F.3d 1420, 1427-28 (5th Cir. 1995) (stating, in non-capital case, that "the use of anonymous juries will be upheld where evidence at trial supports the conclusion that anonymity was warranted"). However, a district court's decision to empanel an anonymous jury in a non-capital case, when made, must rest on something more than speculation or inferences of potential risk. *See Krout*, 66 F.3d at 1427.

Neither Section 3432 nor any other statute requires that a district court conduct an evidentiary hearing before deciding to empanel an anonymous jury, provided that the court's decision is supported by compelling evidence of record. *See United States v. Eufrasio*, 935 F.2d 553, 574 (3d Cir. 1991) ("[a] trial court has discretion to permit an anonymous jury without holding an evidentiary hearing on juror safety"). Nevertheless, it is advisable for a district court deciding to empanel an anonymous jury to support its conclusion with express findings based on evidence of record, because a court's failure to state a basis for its decision sufficient to permit appellate review may constitute an abuse of discretion. *See United States v. Morales*, 655 F.3d 608, 621 (7th Cir. 2011).

---

[12]We note that courts have held that even when a district court has committed an abuse of discretion in empaneling an anonymous jury, the error was subject to harmless error review. *See e.g.*, *Mansoori*, 304 F.3d at 649-52; *United States v. Sanchez*, 74 F.3d 562, 565 (5th Cir. 1996). In those cases, the appeals courts in their harmless error review considered all evidence in the record, including evidence later introduced at trial. *Id.*

D.

We turn now to address the defendants' arguments regarding the district court's decision to empanel an anonymous jury. According to the defendants, the evidence failed to show that they had the present or future capacity, either personally or through their associates, to harm jurors, and that such action was likely. The defendants assert that the murders in this case all occurred years before the trial, and that all members of the alleged conspiracy had been incarcerated for a long time when the district court rendered its decision. The defendants additionally contend that the district court's decision deprived them of their right to a presumption of innocence and to an impartial jury.

i.

With regard to defendants Dinkins and Gilbert, who were charged with capital offenses, we consider whether the district court abused its discretion in finding that disclosure of the names and addresses of the venire members could have jeopardized their life or safety.[13] As discussed above, the district court's decision concerning the trial of these defendants must be supported by evidence that was in the record at the time of the court's ruling. *See* 18 U.S.C. § 3432. We conclude that the district court's finding was supported by sufficient evidence of record.

We begin by addressing the first three *Ross* factors, and consider whether the record showed that Dinkins and Gilbert participated in organized criminal activity, involving persons who had the capacity to harm jurors and had interfered with the judicial process in the past. *See Ross*, 33 F.3d at 1520. The

---

[13]We consider the arguments of Dinkins and Gilbert separately from those of Goods, based on the different standard of review mandated by 18 U.S.C. § 3432 specific to capital cases rather than that standard provided by 28 U.S.C. § 1863(b)(7).

indictment alleged that Gilbert directed the operations of "Special," a drug-trafficking organization in Baltimore, and that Dinkins and Goods were members of Special. The record contained evidentiary proffers from counsel at the April 2008 hearing regarding certain hearsay statements of John Dowery, the government informant allegedly shot by Dinkins in 2005 and killed by Gilbert and Goods in 2006. At that hearing, counsel for Goods proffered that the Dowery hearsay statements contained "extensive information" about "the Dinkins-Gilbert drug organization in that [Baltimore] neighborhood."[14] Thus, at the time the district court ruled on the anonymous jury issue, the record supported a conclusion that the defendants, by virtue of their association with Special, belonged to a group involved in organized criminal activity. *Id.*

At the time of the district court's decision, the record also showed that the defendants, as members of Special, belonged to an organization that had the capacity to harm jurors. *See id.* A material aspect of this consideration was the fact that the other members of the group, who were not in jail, remained capable of interfering with the judicial process even though the defendants were incarcerated. *See Morales*, 655 F.3d at 622 (decision to empanel anonymous jury was supported by the fact that several gang members remained unindicted, and at least one indicted person was still a fugitive). Moreover, the record before the district court overwhelmingly supported a finding that the defendants previously had engaged in attempts to interfere with the judicial process. *Ross*, 33 F.3d at 1520. In fact, the district court based its decision to empanel an anonymous jury on this consideration alone.

---

[14]In the next section, we address Dinkins' and Gilbert's contention that admission of the Dowery hearsay statements into evidence violated the Federal Rules of Evidence, and their rights under the Confrontation Clause. In view of our conclusion that this evidence was admissible, we need not consider the separate issue whether evidence must be admissible under the Federal Rules of Evidence before it may be considered as supporting a court's decision to empanel an anonymous jury.

The indictment alleged that Gilbert "operated" Special, and that Dinkins and others were its "enforcers," who "committed acts of violence to protect the reputation and dominant position of the organization." The indictment charged Dinkins and Gilbert with murdering Shannon Jemmison "in order to prevent Jemmison from cooperating or continuing to cooperate with law enforcement authorities" in the prosecution of another narcotics trafficking organization in Baltimore. Regarding the unsuccessful first attempt on Dowery's life, the indictment alleged that Dinkins shot Dowery multiple times in October 2005. The indictment also charged Gilbert and Goods with killing Dowery in November 2006, whom they knew to be "cooperating with law enforcement authorities in the federal investigation and prosecution of members of the conspiracy."

Consistent with the indictment's allegations that Dinkins shot Dowery in 2005, and that Gilbert and Goods killed Dowery because he was a government informant, the record before the district court contained evidence supporting those allegations. In their motion to strike the government's notice of intent to seek the death penalty and requesting an evidentiary hearing, counsel for Dinkins and Gilbert summarized evidence of an expected government witness, Frank Batts, who had testified before the grand jury in this case, and also had testified in other cases. In their motion, counsel for Dinkins and Gilbert cited Batts' testimony that:

> (1) he frequently bought heroin from Mr. Gilbert; (2) that Mr. Batts allegedly was asked by Mr. Gilbert to aid in arranging the murder of Shannon Jemmison, and that Mr. Gilbert selected Mr. Dinkins to carry out the murder; (3) that Mr. Batts drove Mr. Dinkins to and from the murder scene, and made payment to him; (4) that he testified before the grand jury in this matter; and (5) that Mr. Batts supplied the gun for the Jemmison homicide.

At the April 2008 hearing, counsel for Goods also made a proffer concerning certain hearsay statements made by Dowery in testimony given at a trial in a state court involving other members of Special, Tamall Parker and Tracy Love, who were being tried on first-degree murder charges.[15] The government proffered that Dowery's testimony from the state trial would show that Love had contacted Dowery by telephone from jail, and had threatened him in an apparent attempt to prevent his testimony. And, counsel for Goods also proffered that in later hearsay statements, Dowery discussed the attempt on his life in 2006, and "he name[d] Mr. Dinkins and one other individual as the shooters." Accordingly, the nature of the present prosecution, in which the defendants were charged with murdering government informants and witnesses, as well as evidence of similar uncharged conduct, weighed heavily in favor of the district court's decision to empanel an anonymous jury. *See e.g.*, *United States v. Thai*, 29 F.3d 785, 801 (2d Cir. 1994) (upholding use of anonymous jury when the record supported a charge that several defendants conspired to threaten, and later to kill, a witness in order to subvert a prosecution of fellow gang members).

We also examine the fourth *Ross* factor, and consider whether the defendants all faced the possibility of severe punishments if convicted. *Ross*, 33 F.3d at 1520. Dinkins and Gilbert each faced a potential death sentence or a term of life imprisonment. These potential punishments lend support to a conclusion that Dinkins and Gilbert had an incentive to resort to "extreme measures in any effort to influence the outcome of their trial." *DeLuca*, 137 F.3d at 32 (citing *Ross*, 33 F.3d 1520).

Because the record does not indicate whether the trial resulted in extensive publicity, we do not address the fifth

---

[15]As previously explained, Parker and Love also were charged as co-conspirators in the indictment in this case. They each entered guilty pleas in October 2008.

*Ross* factor in considering whether an anonymous jury was warranted.[16] Accordingly, with regard to defendants Dinkins and Gilbert, we conclude that when the district court rendered its decision to empanel an anonymous jury, the record established by a preponderance of the evidence that the lives or safety of the venire members may have been jeopardized if their names, addresses, and places of employment, or such information pertaining to their spouses, had been provided to the parties. *See* 18 U.S.C. § 3432.

ii.

With regard to defendant Goods, we consider whether the district court abused its discretion in finding that there was strong reason to conclude that the jury needed protection from interference or harm. *See Shryock*, 342 F.3d at 971 (citing *DeLuca*, 137 F.3d at 31). As we have stated, Section 3432 does not apply to Goods, because he was not charged with a capital offense. Instead, the broader "interests of justice" standard provided by Section 1863(b)(7) ultimately governs our review of the district court's decision.

Evidence that supports a finding under the more restrictive Section 3432 standard, that disclosure of identifying information about the venire members may jeopardize their lives or safety, necessarily will also support a finding under the broader standard in Section 1863(b)(7) that the "interests of justice" support anonymity of the venire. Although we have already found that the district court's decision to empanel an anonymous jury for capital defendants Dinkins and Gilbert satisfied Section 3432, we separately consider the issue with respect to the non-capital defendant Goods, because much of the evidence discussed above did not address Goods' role in Special or its criminal activities. And, in this inquiry under

---

[16]Further, even if the fifth *Ross* factor weighed against the district court's decision to empanel an anonymous jury, we conclude that the factors, on balance, support the court's decision.

Section 1863(b)(7), we are permitted to consider all the evidence in the record in determining whether the district court abused its discretion in ordering that Goods be tried by an anonymous jury. *See Shryock*, 342 F.3d at 971-72; *Krout*, 66 F.3d at 1427-28.

We conclude that evidence in the record well supported the district court's finding. With regard to the first three *Ross* factors, the record supported a finding that Goods participated in organized criminal activity involving persons who had the capacity to harm jurors and had interfered with the judicial process in the past. *See Ross*, 33 F.3d at 1520. Goods, like Dinkins and Gilbert, was alleged to be a member of Special. Detective Michael Baier testified at trial that on multiple occasions, he witnessed Goods and associates of Gilbert participating in suspected narcotics transactions. Further, Randy McLean, a member of Special, testified about the "close-knit" nature of narcotics dealers in that neighborhood, and stated that Goods sold narcotics on the same streets as McLean and Gilbert.

As discussed above, the record also showed that Special was an organization that continued to have the capacity to harm jurors. *Id.* Notably, Detective Baier testified that Dowery had identified several additional persons who were involved in narcotics trafficking for Special and were not co-defendants in this case. At least one of Gilbert's former associates evidently was not in custody, because Baier testified that this associate was observed attending the trial in the present case.

The evidence concerning past attempts to interfere with the judicial process weighs heavily in favor of the district court's decision. *See id.* The evidence at trial revealed that the defendants and their associates all knew that Dowery was a government informant, and that members of Special habitually targeted "snitches." The present indictment charged Goods, a member of Special, with murdering Dowery. The evidence at

trial supported the district court's conclusion regarding this effort by Gilbert and Goods, and earlier efforts by Goods' associates, to interfere with the judicial process.

The fourth *Ross* factor also supports a finding that juror anonymity was warranted. Even though Goods was not subject to the death penalty, Goods faced the possibility of life imprisonment. Finally, as explained above, because the record contains no indication that there was extensive publicity in this case, we do not address the fifth *Ross* factor. Therefore, based on the record before us with respect to defendant Goods, we conclude that the record supported the district court's conclusion that an anonymous jury was warranted in this case because the jury needed protection from potential interference or harm that could be caused by Goods' fellow gang members.

### iii.

This determination, however, does not conclude our inquiry. In our review of a district court's decision to empanel an anonymous jury, we also must consider whether the district court took reasonable precautions to minimize the risk that the defendants' rights could be infringed. *Shryock*, 342 F.3d at 971 (citing *DeLuca*, 137 F.3d at 31). The defendants do not identify any particular prejudice that resulted from the employment of an anonymous jury in their case but, instead, allege generally that their right to a presumption of innocence and right to a fair and impartial jury were infringed.

In order to protect a defendant tried by an anonymous jury from having the jury conclude that the defendant is a dangerous person from whom the jurors must be protected, *Ross*, 33 F.3d at 1519, courts customarily provide the jury a non-prejudicial reason for their anonymity. *See e.g.*, *Shryock*, 342 F.3d at 972 (juror anonymity was intended "to protect their privacy from curiosity-seekers"); *Darden*, 70 F.3d at 1532 (juror anonymity was intended to avoid juror harassment by

the media). The decision regarding the precautions that are reasonably necessary to safeguard the rights of a defendant is necessarily a fact-specific inquiry.

In the present case, as stated above, defense counsel requested at the pre-trial hearing a jury instruction stating that the reason for juror anonymity was to protect the jurors from unwanted media publicity. Although the district court indicated that it was willing to instruct the jury on this point, an instruction of this nature was not given at the trial. However, the record also reveals that defense counsel failed to request such an instruction at any point during the trial. Therefore, on appeal, in the absence of compelling evidence, we will not consider the defendants' complaint that their presumption of innocence was adversely affected in this regard. *See Mansoori*, 304 F.3d at 652 (when the district court was willing to give a curative instruction on juror anonymity, but the defendants did not remind the court to do so, the defendants could not contest that omission on appeal).

We are unable to discern in the present case any adverse effect on the presumption of the defendants' innocence resulting from the measures taken by the district court to preserve the anonymity of the jury. The venire members and those later selected as jurors never were informed that any of their biographical information was being withheld from the parties. And, significantly, nothing in the juror questionnaire or the instructions given by the district court reasonably suggested that the district court had taken measures to protect the jurors from potential harm caused by the defendants or their associates. Therefore, we conclude that the district court's communications to the venire members, and ultimately to the jurors, properly followed "the generally accepted practice for minimizing prejudice, which is to downplay (not accentuate) the significance of the juror anonymity procedure." *Ochoa-Vasquez*, 428 F.3d at 1037. Additionally, we observe that any remote possibility of harm was mitigated further because the

district court properly instructed the jury on the presumption of innocence.

We next consider whether the district court took reasonable measures to ensure that the defendants' right to trial by an impartial jury was not infringed by the decision to empanel an anonymous jury. As explained above, the withholding of biographical information from counsel may hinder the parties' ability to conduct a thorough voir dire examination and to exercise their peremptory challenges. *Benabe*, 654 F.3d at 760; *Mansoori*, 304 F.3d at 650.

Our review of the record reveals that the district court took appropriate measures to safeguard the defendants' right to trial by an impartial jury. Counsel for all parties collaboratively drafted the extensive juror questionnaire that was sent to prospective jurors. While the names and addresses of the venire members, and of their spouses, were withheld from counsel, any possibility of prejudice stemming from this omission was lessened significantly because counsel were provided the zip codes, the county, and the neighborhoods in which the prospective jurors resided. The juror questionnaire also included many questions concerning the employment of the venire members and of their spouses. Individual voir dire of the prospective jurors was conducted over the course of four days, and the defendants have not identified any specific aspect of this jury selection process that allegedly was inadequate or resulted in prejudice to them. Therefore, based on the above considerations, we conclude that the defendants' right to an impartial jury was not infringed by the district court's decision retaining juror anonymity.

In conclusion, we hold that evidence in the record supported the district court's findings that an anonymous jury was necessary, and that the district court took reasonable precautions to safeguard the defendants' rights. *See* 18 U.S.C. § 3432; 28 U.S.C. § 1863(b)(7). Accordingly, we further hold

that the district court did not abuse its discretion in deciding to empanel an anonymous jury.

V.

We next consider the defendants' contention that the district court erred in rejecting their *Batson* challenge. The defendants challenge the striking of prospective juror Number 6, who is an African-American female. The defendants argue that the government's purportedly race-neutral reasons for striking prospective juror Number 6 were based on her responses that were nearly identical to those of Caucasian venire members who ultimately were permitted to serve on the jury. Therefore, the defendants argue, the government's proffered race-neutral reasons were pretextual. We disagree with the defendants' argument.

We accord great deference to the district court's determination whether a peremptory challenge was exercised for a racially-discriminatory reason. *Jones v. Plaster*, 57 F.3d 417, 421 (4th Cir. 1995). The outcome of a typical *Batson* challenge turns largely on an evaluation of credibility and whether counsel's race-neutral explanation for a particular challenge is believed. *Hernandez v. New York*, 500 U.S. 352, 365 (1991) (plurality opinion). The district court is especially well suited to make this assessment because the court "has observed with its own eyes the very act in dispute." *Jones*, 57 F.3d at 421. Thus, we review the district court's determination for clear error. *United States v. Farrior*, 535 F.3d 210, 220 (4th Cir. 2008).

The burden-shifting framework for proving a *Batson* violation is firmly established. First, the defendant must make a prima facie showing that the government exercised a peremptory challenge on the basis of race. Second, once the defendant has made such a prima facie showing, the burden shifts to the government to provide a non-discriminatory reason for its use of the peremptory challenge. Third, the defendant next

must establish that the government's proffered reasons were pretextual, and that the government engaged in intentional discrimination. *See United States v. Barnette*, 644 F.3d 192, 203-04 (4th Cir. 2011) (citing *Johnson v. California*, 545 U.S. 162, 168 (2005) (other citations omitted)); *Farrior*, 535 F.3d at 220-21 (same).

Here, we proceed directly to the second step of the *Batson* analysis.[17] The second step only requires that the government provide a race-neutral reason for the exercise of its peremptory challenge. The government need not provide "an explanation that is persuasive, or even plausible," so long as discriminatory intent is not inherent in the explanation. *Purkett v. Elem*, 514 U.S. 765, 768 (1995).

We consider four race-neutral reasons proffered by the government in support of its decision to strike prospective juror Number 6.[18] The government argues that it exercised its peremptory challenge because: (1) prospective juror Number 6's husband had been charged with assault; (2) she had two friends who had been murdered; (3) her mother and father used drugs during her "whole childhood"; and (4) she had four children who were each between five and ten years of age.

We conclude that the above reasons are facially race-

---

[17]We assume, without deciding, that the defendants met their burden of establishing a prima facie case of discrimination at step one, because the government articulated the reasons for its peremptory challenge. *See United States v. McMillon*, 14 F.3d 948, 952 (4th Cir. 1994) ("we will not examine whether the defendant has met his burden in establishing a prima facie case where the prosecutor articulates reasons for its strikes").

[18]We do not address whether prospective juror Number 6's views on the death penalty supported the government's peremptory challenge, because the government did not advance that justification on appeal. *United States v. Powell*, 666 F.3d 180, 185 n.4 (4th Cir. 2011) (holding that the government abandoned arguments raised below by not presenting them in the government's appellate brief).

neutral and support the government's exercise of this peremptory challenge. *See e.g.*, *United States v. Bynum*, 3 F.3d 769, 772 (4th Cir. 1993) (relative's drug use deemed race-neutral explanation for peremptory strike); *United States v. Hart*, 544 F.3d 911, 915 (8th Cir. 2008) (prosecution of close family member deemed race-neutral explanation); *Greene v. Upton*, 644 F.3d 1145, 1156 (11th Cir. 2011) (childcare considerations deemed race-neutral explanation). Therefore, the government satisfied its burden at the second step of the *Batson* inquiry.

At the third step of this inquiry, the defendants must show that the government's proffered race-neutral reasons were "merely pretextual," and that the government exercised the particular peremptory challenge on the basis of race. *McMillon*, 14 F.3d at 953. If the purportedly race-neutral reason offered by the government for striking an African-American member of the venire applies equally to other members of the venire who are otherwise similarly-situated, but who are not African-American, that is evidence tending to prove purposeful discrimination. *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005). The ultimate burden always rests with the party challenging the peremptory strike to prove purposeful discrimination, *Farrior*, 535 F.3d at 221 (citing *Howard v. Moore*, 131 F.3d 399, 407 (4th Cir. 1997) (en banc)), by comparative juror analysis or by other proof. *See Golphin v. Branker*, 519 F.3d 168, 179-80 (4th Cir. 2008).

In this case, the defendants compare the voir dire and questionnaire responses of prospective juror Number 6 with those of other venire members not challenged by the government, as evidence that the government's reasons for striking prospective juror Number 6 were pretextual. The defendants repeatedly compare prospective juror Number 6 with prospective juror Number 190, a Caucasian female ultimately seated on the jury. While we agree that prospective jurors Number 6 and Number 190 present the closest comparison for *Batson* purposes, we conclude that the defendants have not estab-

lished that the government engaged in purposeful discrimination.

The government proffered that it struck prospective juror Number 6 in part because she had four young children, all between the ages of five and ten. During voir dire, prospective juror Number 6 had expressed concern that she would have trouble arranging for childcare, although she stated that "[i]t would somehow be workable." The government argued that it was entitled to consider the fact that serving on the jury could pose a measure of hardship for prospective juror Number 6, and that childcare considerations could be a significant distraction to her during the trial. In contrast, prospective juror Number 190 had one son in his twenties, and the defendants have not identified another similarly-situated venire member who expressed concerns about arranging care for young children.

Additionally, the government advanced another reason to the district court to explain why prospective juror Number 190 was not similarly situated to prospective juror Number 6. Prospective juror number 190 had been married for 25 years to a deputy sheriff, and the government concluded on this basis that prospective juror Number 190 was "going to be much more favorable" to the government.

The government was entitled to consider this employment in determining who might be a favorable juror, irrespective whether other factors distinguished one venire member from another. *Cf. Smulls v. Roper*, 535 F.3d 853, 867 (8th Cir. 2008) (venire member's occupation deemed race-neutral). Further, we observe that although this consideration could not, of itself, resolve conclusively whether the government struck prospective juror Number 6 for race-neutral reasons, that additional factor nonetheless is relevant as a race-neutral comparative factor distinguishing the two prospective jurors. *See Golphin*, 519 F.3d at 179-80. Based on this record, we conclude that the defendants did not meet their burden at step

three of the *Batson* inquiry to prove that the government engaged in purposeful discrimination, or that the race-neutral reasons offered by the government for striking prospective juror Number 6 were pretextual. Accordingly, we hold that the defendants have failed to show clear error in the district court's denial of their *Batson* challenge.

## VI.

Dinkins and Gilbert next argue that the district court erred by admitting Dowery's hearsay statements into evidence, in violation of Rule 804(b)(6) of the Federal Rules of Evidence and the Confrontation Clause. Dinkins and Gilbert also contend that under the holding of *Giles v. California*, 554 U.S. 353 (2008), the forfeiture-by-wrongdoing exception to the hearsay rule was inapplicable because there was no proof that Dowery was murdered to prevent him from testifying.

In response, the government asserts that the evidence was admissible under Rule 804(b)(6). Additionally, the government relies on the common law hearsay exception of forfeiture-by-wrongdoing, the historical antecedent of Rule 804(b)(6), contending that admission of the challenged evidence did not violate the Confrontation Clause or run contrary to the holding in *Giles*, because the defendants all engaged in, or acquiesced in, intentional wrongdoing that accomplished the goal of rendering Dowery unavailable as a witness.

## A.

The Dowery hearsay statements were highly relevant to the government's theory of the case. As stated above, at issue here are three discrete sets of statements made by Dowery to police officers before he was killed in 2006. Most of these statements were made to Detective Baier, who investigated the murder of James Wise, a drug dealer who had stolen narcotics and firearms in 2004 from members of Special before he was killed.

The first challenged hearsay statements were Dowery's statements to Detective Baier concerning narcotics Dowery purchased from Special group members operating in Bartlett. Dowery had told Baier that Gilbert "ran the group," and that Love, Parker, and McLean were Gilbert's "lieutenants." Dowery also had identified several others who worked with Gilbert, including Dowery's son, Cecil Dowery. In the second challenged hearsay statement, Dowery had identified Dinkins from a photo array as one of the men who had shot him.

Dowery also had informed Detective Baier that he had received a message from Gilbert, through Dowery's son Cecil. The message, which was the third challenged hearsay statement presented at trial, was: "I know where you are at. I know where you walk your girl to the bus stop. I can get you out there. Don't come around here."

The government argued at trial that the above hearsay statements were admissible against the defendants based on Rule 804(b)(6) and the hearsay exception of forfeiture by wrongdoing. The district court admitted the statements through the testimony of Baltimore City Police Department Detective Gary Niedermeier and Detective Baier.

## B.

We review the district court's evidentiary rulings for abuse of discretion, and the court's legal conclusions regarding constitutional claims de novo. *United States v. Abu Ali*, 528 F.3d 210, 253 (4th Cir. 2008). The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The Confrontation Clause requires that an accused be given the opportunity to confront any witness who gives testimony against him, unless a well-established common law exception would permit the admission of the evidence. *See Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). The common law

doctrine of forfeiture by wrongdoing is such an exception, which allows testimonial statements to be admitted when the defendant's own misconduct caused the declarant to be unavailable at trial. *Davis v. Washington*, 547 U.S. 813, 833 (2006).

In *Reynolds v. United States*, 98 U.S. 145 (1878), the Supreme Court first addressed this exception, explaining that while the Confrontation Clause provides a defendant the right to be confronted with the witnesses against him, "if a witness is absent by [the defendant's] own wrongful procurement, he cannot complain if competent evidence is admitted to supply the place of that which he has kept away." *Id.* at 158. In *Davis*, over a century later, the Supreme Court again emphasized that "one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation." *Davis*, 547 U.S. at 833.

Rule 804(b)(6) of the Federal Rules of Evidence adopted this well-established common law exception to the hearsay rule. *Davis*, 547 U.S. at 833. Rule 804(b)(6) provides, in relevant part:

> The following are not excluded by the rule against hearsay if the declarant is unavailable as a witness . . . (6) Statement Offered Against a Party That Wrongfully Caused the Declarant's Unavailability. A statement offered against a party that wrongfully caused — or acquiesced in wrongfully causing — the declarant's unavailability as a witness, and did so intending that result.

Before applying the forfeiture-by-wrongdoing exception, a trial court must find, by a preponderance of the evidence, that "(1) the defendant engaged or acquiesced in wrongdoing (2) that was intended to render the declarant unavailable as a witness and (3) that did, in fact, render the declarant unavailable as a witness." *United States v. Gray*, 405 F.3d 227, 241 (4th

Cir. 2005). And, in *Giles*, the Supreme Court clarified that the forfeiture-by-wrongdoing exception applies "only when the defendant engaged in conduct *designed* to prevent the witness from testifying." 554 U.S. at 359 (emphasis in original).

The purpose of the forfeiture-by-wrongdoing exception is to prevent "abhorrent behavior which strikes at the heart of the system of justice itself." Fed. R. Evid. 804(b)(6) advisory committee note (citation and internal quotation marks omitted). To effectuate this purpose, federal courts have broadly construed the elements of the forfeiture-by-wrongdoing exception. *Gray*, 405 F.3d at 241-42.

The *Giles* decision did not materially alter application of the forfeiture-by-wrongdoing exception by requiring the government to prove that the defendant's actions were undertaken for the purpose of preventing the witness from testifying. *See id.* 554 U.S. at 367-68. Instead, the plain language of Rule 804(b)(6) imposes this evidentiary requirement. Moreover, we have upheld the admission of evidence under a theory of forfeiture by wrongdoing only when the government has shown by a preponderance of the evidence that the defendant's wrongdoing "was intended to render the declarant unavailable as a witness." *Gray*, 405 F.3d at 241. Therefore, we continue to apply our precedent on the doctrine of forfeiture by wrongdoing, as reaffirmed by the Supreme Court's decision in *Giles*.

## C.

We turn to address Dinkins' contention that the forfeiture-by-wrongdoing exception did not apply to Dowery's statements regarding Dinkins' acts, because Dinkins did not participate in any wrongdoing that caused Dowery's death. Dinkins argues that by the time that Dowery was killed in November 2006, Dinkins had been in jail for about a year, and no evidence was presented to show that he participated in the murder.

The government, however, argues that the statements were admissible under principles of conspiratorial liability articulated in *Pinkerton v. United States*, 328 U.S. 640 (1946). The government contends that the fact Dinkins was incarcerated when his co-conspirators in Special successfully eliminated Dowery as a witness, a task Dinkins initiated when he originally shot Dowery in 2005, did not entitle Dinkins to escape responsibility for Dinkins' acts of attempting to prevent Dowery from testifying.

We have not yet considered the question whether hearsay statements may be admitted under the forfeiture-by-wrongdoing exception pursuant to a conspiracy theory of liability, when a defendant's co-conspirators engaged in the wrongdoing that ultimately rendered the declarant unavailable as a witness. We now conclude that traditional principles of conspiracy liability are applicable within the forfeiture-by-wrongdoing analysis.

The principles of conspiratorial liability articulated in *Pinkerton* provide that a person is "liable for substantive offenses committed by a co-conspirator when their commission is reasonably foreseeable and in furtherance of the conspiracy." *United States v. Ashley*, 606 F.3d 135, 142-43 (4th Cir. 2010). Thus, *Pinkerton* liability encompasses a person who, while not directly committing an offense, has "participat[ed] in a conspiracy that leads a confederate to engage in that conduct." *Ashley*, 606 F.3d at 143. The principle underlying the *Pinkerton* doctrine is that "conspirators are each other's agents; and a principal is bound by the acts of his agents within the scope of the agency." *United States v. Aramony*, 88 F.3d 1369, 1379 (4th Cir. 1996) (quoting *United States v. Manzella*, 791 F.2d 1263, 1267 (7th Cir. 1986)).

The language of Rule 804(b)(6) supports the application of *Pinkerton* principles of conspiratorial liability in the forfeiture-by-wrongdoing context, by requiring that the defendant either have "wrongfully caused — *or acquiesced in*

*wrongfully causing* — the declarant's unavailability." Fed. R. Evid. 804(b)(6) (emphasis added). The term "acquiesce," within the meaning of Rule 804(b)(6), encompasses wrongdoing that, while not directly caused by a defendant co-conspirator, is nevertheless attributable to that defendant because he accepted or tacitly approved the wrongdoing. *See United States v. Thompson*, 286 F.3d 950, 964 (7th Cir. 2002) (in the context of Rule 804(b)(6), defining "acquiesce" as "to accept or comply tacitly or passively," and noting that "acquiescence itself is an act" that can result in application of the forfeiture-by-wrongdoing exception).

Our conclusion is supported by decisions of our sister circuits applying principles of conspiratorial liability in this context. We relied on the Tenth Circuit's decision in *United States v. Cherry* in our decision in *Gray*. We cited the holding in *Cherry* that a "declarant's statements may be admitted against a person who participated in a conspiracy to silence the declarant even if that person did not himself engage in witness intimidation or other wrongdoing." *Gray*, 405 F.3d at 242 (citing *Cherry*, 217 F.3d 811, 820 (10th Cir. 2000)).

In *Cherry*, the court reasoned that the balancing of a defendant's rights under the Confrontation Clause against the interest of courts in preventing witness tampering warranted application of *Pinkerton* principles in the forfeiture-by-wrongdoing context. The court explained:

> Failure to consider *Pinkerton* conspiratorial responsibility affords too much weight to Confrontation Clause values in balancing those values against the importance of preventing witness tampering. By recognizing the applicability of agency concepts and permitting admission of the testimony of an unavailable witness against a co-conspirator involved in, but not necessarily responsible for, procuring that witness's unavailability, a *Pinkerton* theory strikes a

better balance between the conflicting principles at stake.

217 F.3d at 820 (internal citations omitted).

We are persuaded by this reasoning that application of principles of conspiratorial liability in the forfeiture-by-wrongdoing context strikes the appropriate balance between the competing interests involved. *See Thompson*, 286 F.3d at 963-64 (adopting the *Cherry* analysis). Mere participation in a conspiracy will not trigger the admission of testimonial statements under a forfeiture-by-wrongdoing theory. Instead, a defendant in such circumstances would only waive his Confrontation Clause rights when (1) the defendant participated directly in planning or procuring the declarant's unavailability through wrongdoing; or (2) the wrongful procurement was in furtherance, within the scope, and reasonably foreseeable as a necessary or natural consequence of an ongoing conspiracy. *Cherry*, 217 F.3d at 820. While we think that proper application of *Pinkerton* liability standards in the forfeiture-by-wrongdoing context generally will be coextensive with the scope of forfeiture by wrongdoing as articulated in *Giles*, a court's decision under the second prong in *Cherry* must be supported by evidence that the defendant "engaged in conduct *designed* to prevent the witness from testifying." *Giles*, 554 U.S. at 359 (emphasis in original).

In the present case, the evidence showed that the murder of Dowery in November 2006 was in furtherance, within the scope, and reasonably foreseeable as a natural consequence of an ongoing conspiracy of which Dinkins was a member. The allegation that Dinkins, Gilbert, and Goods were members of Special, a narcotics trafficking organization in Baltimore, was well supported by the record.

Dowery was a government informant who had testified against Parker and Love, who were also members of Special, at their trial on charges of murdering Wise. Because Dowery

had substantial knowledge about the operations of Special, which he was willing to provide to law enforcement officers, he posed a continuing liability to members of Special. Also, the evidence showed that it was common knowledge that Dowery was a government informant, and that Dinkins and other members of Special "targeted" government informants. Included in this evidence was the fact that Dinkins killed Jemmison because he was cooperating in a government investigation.

After Dowery provided various information to law enforcement officers, Dinkins and co-conspirator Damien West attempted to murder Dowery in October 2005, and succeeded in shooting him several times. When Dinkins learned that Dowery had not died as a result of his wounds, Dinkins stated that he and West had "to go to the hospital to finish him off." These actions substantiate the ongoing nature of Special's scheme to murder Dowery.

Although Dinkins was incarcerated shortly after the murder attempt, threats of violence against Dowery continued to be made by members of Special. Gilbert, the leader of Special, was able to communicate a threat to Dowery even after he and his family were relocated for their safety. Finally, evidence showed that Gilbert and Goods shot Dowery, in what can only be considered a targeted killing, immediately upon Dowery's return to the Bartlett area in November 2006.

Dowery's murder certainly was reasonably foreseeable to Dinkins, in view of the fact that he and co-conspirator West nearly had succeeded in murdering Dowery the year before, and had manifested the intent to "finish the job." And, in view of other evidence in the record establishing a pattern of intimidation and violence with respect to government informants by members of Special, we consider that Dowery's ultimate murder was a natural consequence of the ongoing conspiracy. *See Cherry*, 217 F.3d at 820. Lastly, the record is clear that Dinkins' acts of wrongdoing, as well as those of his co-

conspirators, were intended to prevent, and in fact did prevent, Dowery from testifying. *See Giles*, 554 U.S. at 359. Therefore, we conclude that the district court properly admitted the Dowery hearsay statements against Dinkins under the forfeiture-by-wrongdoing exception to the Confrontation Clause pursuant to *Pinkerton* principles of conspiratorial liability. *See* Fed. R. Evid. 804(b)(6); *Cherry*, 217 F.3d at 820-821.

D.

We also reject Gilbert's challenge to the admission of certain Dowery hearsay statements against Gilbert, namely, Dowery's discussion of the structure and operations of Special, and the threat conveyed by Gilbert to Dowery through Dowery's son Cecil.[19] On appeal, Gilbert contends that the circumstances of Dowery's death "support[ ] the reasonable possibility that his demise was due to a desire by many others in this crime-ridden neighborhood to harm persons known" to be government informants. However, as we already have observed, the record is clear that Gilbert and his co-conspirators engaged in acts of wrongdoing by shooting Dowery on two occasions to prevent Dowery from testifying, because he was a "snitch." The record also is clear that Gilbert and Goods shot and killed Dowery on Thanksgiving Day in 2006, finally succeeding in the prolonged effort to render him unavailable as a witness. Therefore, the record is more than adequate to uphold the district court's admission of Dowery hearsay statements against Gilbert under the forfeiture-by-wrongdoing exception to the Confrontation Clause. *See* Fed. R. Evid. 804(b)(6); *Gray*, 405 F.3d at 241.

---

[19]Goods does not separately challenge the introduction of Dowery hearsay statements in the defendants' briefs to this Court, and, in fact, Goods argued in favor of the admission of such evidence before the district court. Therefore, Goods has waived any challenge to the admission of the Dowery hearsay statements. Even if Goods did preserve this argument for appeal, it would fail for the same reasons we reject Gilbert's challenge to the Dowery hearsay statements.

## VII.

Finally, Goods argues that the district court erred in denying his Rule 29 motion for judgment of acquittal on his counts of conviction.[20] Goods contends that the weight of the evidence introduced at trial showed that Gilbert, the first shooter, instantly killed Dowery when Gilbert fired three shots at Dowery's head. Goods argues that even if the government had proved that he was the second shooter, the government did not prove that he murdered Dowery because the evidence failed to establish that Dowery was alive when Goods fired the shots. We disagree, because Goods' argument is not supported by the present record.

We review de novo the denial of a Rule 29 motion for judgment of acquittal. *United States v. Penniegraft*, 641 F.3d 566, 571 (4th Cir. 2011). When we review the sufficiency of the evidence after a conviction, we consider the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the government. *United States v. Lomax*, 293 F.3d 701, 705 (4th Cir. 2002). We will sustain the jury verdict if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Penniegraft*, 641 F.3d at 571-72 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in *Jackson*). In our review of a Rule 29 motion, we remain cognizant that it is the jury's province to weigh the credibility of the witnesses, and to resolve any conflicts in the evidence. *United States v. Alerre*, 430 F.3d 681, 693 (4th Cir. 2005).

---

[20]As previously stated, Goods was convicted of several counts related to the murder of Dowery: murder with intent to prevent the attendance and testimony of a person in an official proceeding, and to prevent the communication of information regarding a federal offense to law enforcement; use of a firearm in furtherance of a drug-trafficking crime; and willfully causing the death of a person by using a firearm in furtherance of a drug-trafficking crime.

At trial, Anthony Parker testified that he was working as a bartender at Kozy Korner on November 23, 2006, which was Thanksgiving Day. Parker testified that at about 9:00 p.m., only he, his daughter Tonielle Parker, and Dowery, who was Tonielle's boyfriend, were inside the bar. Dowery and Tonielle sat on barstools one seat apart from each other.

Parker testified that a man wearing a hood pulled tightly around his face entered the bar, shot Dowery in the head three times, and departed. Parker testified that when he attempted to close the door behind the shooter seconds later, another person entered the bar and shot Dowery in the head three more times. The second shooter also wore a hood that was pulled tightly around his face. Parker testified that when he saw Dowery, "it looked like he was dead," but Parker did not state whether he reached this conclusion before or after the second person shot Dowery.

Randy McLean, a member of Special, testified that on Thanksgiving Day in 2006, he was at his grandmother's house across the street from Kozy Korner. McLean stated that he spent a significant portion of Thanksgiving Day with Gilbert and Goods, and that he ate dinner with Gilbert. As a result, McLean stated that he "knew" the clothes worn by Gilbert and Goods that day.

McLean testified that on Thanksgiving evening, from his grandmother's house, he saw Goods standing outside Kozy Korner wearing a familiar "hoodie." McLean soon observed Gilbert, who also was wearing a familiar hoodie, run into the bar. McLean heard gunshots, saw Gilbert run out of Kozy Korner and, immediately thereafter, observed Goods enter the bar. McLean heard more shots being fired inside the bar, after which he saw Goods run out of the bar.

The government also introduced expert testimony from Dr. Donna M. Vincenti, a medical examiner employed by the

Maryland Office of the Chief Medical Examiner.[21] Dr. Vincenti testified that Dowery had been shot six times, and that he died as a result of "[m]ultiple gunshot wounds." According to Dr. Vincenti, two of the gunshot wounds, one to Dowery's head and the other to his neck and spinal cord, had a possibility of being "rapidly fatal." Dr. Vincenti testified that the other four gunshot wounds, which struck or grazed Dowery's skull, back, and neck, were not likely to have been "rapidly fatal." Dr. Vincenti was careful to clarify, however, that "when I say not rapidly fatal, that doesn't mean that a wound in and of itself wouldn't be fatal, [it] just probably wouldn't be within second[s] or minutes."

Based on this record, we conclude that the government presented substantial evidence that Gilbert and Goods shot Dowery a total of six times, and that Dowery died as a result of those wounds. A rational trier of fact could have found that the shots fired by Goods, in connection with the shots previously fired by Gilbert, jointly caused Dowery's death. Evidence was presented that Gilbert and Goods shot Dowery in rapid succession, within "seconds" of each other. While Dr. Vincenti testified that one of Dowery's head wounds likely was "rapidly fatal," Parker testified that he had witnessed both Gilbert and Goods fire shots at Dowery's head. Significantly, the evidence presented did not show that any individual wound that likely caused Dowery's immediate death was traceable to either Gilbert or Goods. In sum, Goods' argument is not supported by the record, because a rational finder of fact would be entitled to base a verdict on substantial evidence that Dowery died as a result of multiple gunshot wounds inflicted by Gilbert and Goods.

---

[21]Dr. Vincenti did not perform the post-mortem examination of Dowery, which was conducted by Dr. Tasha Greenberg. However, Dr. Vincenti reviewed the post mortem examination materials, and was accepted by the district court without objection as being qualified to offer expert testimony on this issue.

## VIII.

In conclusion, we hold that the district court did not abuse its discretion by empaneling an anonymous jury. The district court's finding that anonymity was necessary to protect the venire members and the jurors was supported amply by the record. The district court also took reasonable measures to safeguard the defendants' rights in light of this protective measure. Also, the challenged hearsay statements of John Dowery properly were admitted under the forfeiture-by-wrongdoing exception to the hearsay rule and the Confrontation Clause. After due consideration, we reject the defendants' other asserted grounds for appeal. Accordingly, we affirm the district court's judgment.

*AFFIRMED*