# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2017-CT-01082-SCT

*SEDRICK BUCHANAN AND ARMAND JONES*
*a/k/a ARMOND JONES a/k/a A.J. JONES*

*v.*

*STATE OF MISSISSIPPI*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 06/15/2017 |
| TRIAL JUDGE: | HON. W. ASHLEY HINES |
| COURT FROM WHICH APPEALED: | LEFLORE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | DAVID P. VOISIN |
| | M. KEVIN HORAN |
| | BRADLEY D. DAIGNEAULT |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BARBARA BYRD |
| DISTRICT ATTORNEY: | WILLIE DEWAYNE RICHARDSON |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND |
| | RENDERED IN PART - 04/08/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**GRIFFIS, JUSTICE, FOR THE COURT:**

¶1.    In this certiorari case, we must determine whether the testimonial statement of an unavailable witness may be introduced against a defendant under Mississippi Rule of Evidence 804(b)(6), otherwise known as the forfeiture-by-wrongdoing hearsay exception. Because the record shows that Armand Jones forfeited by wrongdoing his constitutional right to confront the witness, we affirm his convictions of murder and attempted murder. But

because there was insufficient evidence presented to support Sedrick Buchanan's convictions of aggravated assault, we reverse and render a judgment of acquittal as to Buchanan.

## FACTS AND PROCEDURAL HISTORY

¶2.     On August 15, 2015, at approximately 11:00 p.m., D'Alandis Love, Perez Love, Kelsey Jennings, and Ken-Norris Stigler were traveling west on Highway 82 in a red Pontiac headed to the Moroccan Lounge, a club in Itta Bena. As they were driving, a gold Tahoe approached and opened fire on their vehicle. D'Alandis Love was killed. Perez Love, Jennings, and Stigler were seriously injured.

¶3.     Bill Staten, an investigator with the Leflore County Sheriff's Department, responded to the scene. He examined the Pontiac and noticed that the rear passenger window had been shot out and that there were bullet holes along that particular side of the vehicle. Investigator Staten took photographs and collected evidence, including multiple 7.62 mm shell casings and one .40-caliber shell casing. He also recovered one .40-caliber pistol in the vehicle.

¶4.     Amber Conn, a crime-scene analyst with the Mississippi Bureau of Investigation, also examined the Pontiac. According to Conn, the vehicle was shot from the back toward the front. During her investigation of the vehicle, Conn recovered another .40-caliber pistol located on the front passenger floorboard. The pistol was fully loaded, and its safety was locked.

¶5.     Lisa Funte, the State's medical examiner, opined that D'Alandis Love died as a result of multiple gunshot wounds. According to Funte, the manner of his death was homicide.

¶6.     Jones, Buchanan, Michael Holland, Jacarius Keys, and James Earl McClung, Jr., were

2

developed as suspects in the shooting. On September 3, 2015, Keys, accompanied by his attorney, went to the Leflore County Sheriff's Department and gave a statement to Investigator Staten. Keys's statement, which was videotaped, implicated Jones, Holland, Buchanan, and McClung in the shooting.

¶7. Keys, Jones, Holland, Buchanan, and McClung were later indicted and charged with one count of first-degree murder and three counts of attempted first-degree murder. Approximately five months after the men were indicted, Keys was shot and killed. Holland and Buchanan were considered suspects in Keys's death. It is undisputed that at the time of Keys's death, Jones was incarcerated.

¶8. Before trial, Jones, Holland, Buchanan, and McClung moved to exclude Keys's videotaped statement based on hearsay and the Sixth Amendment Confrontation Clause. The trial court denied the motion and allowed the statement to be admitted into evidence under Mississippi Rules of Evidence 804(b)(3) (the statement-against-interest hearsay exception), 804(b)(5) (the catch-all hearsay exception), and 804(b)(6) (the forfeiture-by-wrongdoing hearsay exception). The defendants further moved to sever their cases. That motion was denied.

¶9. Additionally, before trial, Buchanan moved to exclude testimony and evidence related to his postshooting arrest. After Buchanan was arrested for the shooting but while he was out on bond, a .40-caliber pistol was found in a vehicle in which he was a passenger. The pistol was located beneath the center console between the driver's seat and front passenger seat. The vehicle in which the pistol was found was owned by Buchanan's friend, Danarius

Jackson. The .40-caliber pistol found in the vehicle was purchased by and registered to Jackson. The trial court found that Buchanan's pretrial motion was premature and should be raised at trial.

¶10. At trial, the State presented multiple witnesses including Starks Hathcock, an expert in firearms and toolmarks identification. Hathcock examined the .40-caliber pistol found in Jackson's vehicle but was unable to positively determine whether the gun fired the .40-caliber shell casing recovered at the scene of the shooting. Nevertheless, the pistol was admitted into evidence over Buchanan and Jones's objection.

¶11. Also at trial, Keys's videotaped statement was presented to the jury. This statement is discussed in more detail below.

¶12. Jones, Holland, Buchanan, and McClung were all convicted of various offenses. Relevant to this appeal, the jury found Jones guilty of first-degree murder regarding D'Alandis Love and guilty of three counts of attempted first-degree murder regarding Perez Love, Jennings, and Stigler. Jones was sentenced to serve life in prison for his murder conviction and thirty years for each attempted-murder conviction.

¶13. The jury acquitted Buchanan of the first-degree murder of D'Alandis Love but found Buchanan guilty of the lesser-included offenses of aggravated assault with respect to Perez Love, Jennings, and Stigler. Buchanan was sentenced to serve three consecutive terms of twenty years for each aggravated-assault conviction.

¶14. Jones and Buchanan filed motions for judgment notwithstanding the verdict and for a new trial, which the trial court denied. Jones and Buchanan timely appealed, and each

4

asserted numerous assignments of error.

¶15. On appeal, the Court of Appeals affirmed Jones's and Buchanan's convictions. *Buchanan v. State*, No. 2017-KA-01082-COA, 2019 WL 6490737, at *24 (Miss. Ct. App. Dec. 3, 2019). The court concluded that the trial court did not err by admitting Keys's statement into evidence under Rule 804(b)(6), the forfeiture-by-wrongdoing exception. *Id.* at *9, *10. The court found that sufficient evidence was presented "to reasonably infer a conspiracy at least between Jones and Holland to kill or harm the Loves and that Keys's murder was in furtherance and within the scope of that conspiracy." *Id.* at *12. The court determined "that Buchanan engaged in or acquiesced in the wrongdoing that was intended to, and did, procure Keys's unavailability" and "that Holland and Buchanan's waiver-by-misconduct c[ould] be imputed to Jones[.]" *Id.* at *9, *10. The Court of Appeals found no merit in Jones's argument that Keys's statement should have been excluded as self-serving. *Id.* at *12

¶16. Regarding Buchanan's specific assignments of error, the Court of Appeals found that sufficient evidence was presented to support Buchanan's convictions of aggravated assault. *Id.* at *18-20. The court also found that the trial court did not abuse its discretion by allowing the .40-caliber pistol recovered during Buchanan's postshooting arrest and the related testimony into evidence. *Id.* at *15.

¶17. Jones and Buchanan filed separate petitions for certiorari. This Court granted both petitions. In his petition, Jones argues that the trial court erroneously admitted Keys's videotaped statement under Rule 804(b)(6). Buchanan also raises this argument but asserts

two additional arguments: (1) the trial court erroneously admitted evidence regarding a .40 caliber pistol recovered during his postshooting arrest, and (2) insufficient evidence supports his convictions of aggravated assault.

## ANALYSIS

### I.       Armand Jones

#### A.       *Admission of Keys's Videotaped Statement*

¶18.    Jones first argues that the trial court erroneously admitted Keys's videotaped statement under Rule 804(b)(6), the forfeiture-by-wrongdoing hearsay exception.  "Our standard of review regarding admission or exclusion of evidence is abuse of discretion." *Jenkins v. State*, 102 So. 3d 1063, 1065 (Miss. 2012) (internal quotation marks omitted) (quoting *Smith v. State*, 25 So. 3d 264, 269 (Miss. 2009)).  "Constitutional issues are reviewed de novo." *Id.* (citing *Smith*, 25 So. 3d at 269).

¶19.    Both the United States Constitution and the Mississippi Constitution guarantee a defendant in a criminal prosecution the right to confront the witnesses against him.  U.S. Const. amend. VI (applicable to the states through U.S. Const. amend. XIV); Miss. Const. art. 3, § 26.  The United States Supreme Court has held that a testimonial statement of a witness absent from trial should be admitted only when the witness is unavailable and when the defendant has had a prior opportunity to cross-examine the witness. *Crawford v. Washington*, 541 U.S. 36, 59, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).  But a defendant's right to confront the witnesses is not unlimited and is subject to two clear exceptions.

¶20.    An unavailable witness's unconfronted testimonial statement is admissible if (1) the

"declarations [were] made by a speaker who was both on the brink of death and aware he was dying" or (2) the witness "was 'detained' or 'kept away' by the 'means or procurement' of the defendant." *Giles v. California*, 554 U.S. 353, 358-59, 128 S. Ct. 2678, 171 L. Ed. 2d 488 (2008). The second exception for admissibility is otherwise known as "forfeiture by wrongdoing." *Id.* at 359.

¶21. A party "who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation." *Davis v. Washington*, 547 U.S. 813, 833, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006); *see also Crawford*, 541 U.S. at 62 ("[T]he rule of forfeiture by wrongdoing . . . extinguishes confrontation claims on essentially equitable grounds . . . ."). Likewise, under Rule 804(b)(6), a party forfeits his rights to object to a prior testimonial statement on hearsay grounds if the party "wrongfully caused—or acquiesced in wrongfully causing—the declarant's unavailability as a witness, and did so intending that result." MRE 804(b)(6); MRE 804(b)(6) advisory comm. note.

¶22. In *Pinkerton v. United States*, Daniel and Walter Pinkerton were convicted of crimes related to the unlawful possession and transportation of whiskey in violation of the internal revenue code. *Pinkerton v. United States*, 328 U.S. 640, 648, 66 S. Ct. 1180, 1184, 90 L. Ed. 1489 (1946). The evidence showed that Walter had acted alone to commit the substantive crimes and that Daniel was actually in the penitentiary when some of the crimes were committed. *Id.* at 647-48. Nevertheless, the Court found that the government had presented sufficient evidence to show that at the time the offenses were committed, the brothers were parties to an unlawful conspiracy and that the substantive offenses were

7

committed in furtherance of that conspiracy. *Id.* Specifically, the Court found that the substantive offenses committed by one of the conspirators were done in furtherance of the conspiracy, fell within the scope of the unlawful project, and were not "merely a part of the ramifications of the plan which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement." *Id.*

¶23. In *United States v. Cherry*, the United States Court of Appeals for the Tenth Circuit found that "*Pinkerton*'s formulation of conspiratorial liability [wa]s an appropriate mechanism for assessing whether the actions of another can be imputed to a defendant for purposes of determining whether that defendant has waived confrontation and hearsay objections." *United States v. Cherry*, 217 F.3d 811, 818 (10th Cir. 2000).[1] The court concluded "that the acquiescence prong of Fed. R. Evid. 804(b)(6), consistent with the Confrontation Clause, permits consideration of a *Pinkerton* theory of conspiratorial responsibility in determining wrongful procurement of witness unavailability . . . ." *Id.*

¶24. Under *Cherry*,

> [a] defendant may be deemed to have waived his or her Confrontation Clause rights . . . if a preponderance of the evidence establishes one of the following circumstances: (1) he or she participated directly in planning or procuring the declarant's unavailability through wrongdoing; or (2) the wrongful procurement was in furtherance, within the scope, and reasonably foreseeable as a necessary or natural consequence of an ongoing conspiracy[.]

*Id.* at 820 (citations omitted). The court clarified that "the scope of the conspiracy is not necessarily limited to a primary goal—such as bank robbery—but can also include secondary

---

[1] Decisions of federal appellate courts are persuasive, not mandatory, authority and are not binding on this Court.

goals relevant to the evasion of apprehension and prosecution for that goal—such as escape, or, by analogy, obstruction of justice." *Id.* at 821.

¶25.    Two years later, in *United States v. Thompson*, the United States Court of Appeals for the Seventh Circuit considered the *Cherry* conspiratorial responsibility test and recognized that "acts taken to prevent apprehension" including "[w]itness tampering . . . can constitute waiver-by-misconduct." *United States v. Thompson*, 286 F.3d 950, 964 (7th Cir. 2002) (citations omitted).

¶26.    The United States Supreme Court addressed the forfeiture-by-wrongdoing exception in *Giles*. *Giles*, 554 U.S. at 359. The Court explained that the forfeiture-by-wrongdoing exception "permitted the introduction of statements of a witness who was 'detained' or 'kept away' by the 'means or procurement' of the defendant." *Id.* The Court further explained that "[t]he terms used to define the scope of the forfeiture rule suggest that the exception applied only when the defendant engaged in conduct *designed* to prevent the witness from testifying." *Id.* The Court recognized that the term "means" could "connote that a defendant forfeits confrontation rights when he uses an intermediary for the purpose of making a witness absent." *Id.* at 360 (internal quotation marks omitted). While forfeiture by wrongdoing was not an exception established at the time of the founding, the Court acknowledged that under Federal Rule of Evidence 804(b)(6), the forfeiture-by-wrongdoing exception applies when the defendant "engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." *Id.* at 366, 367 (internal quotation marks omitted) (quoting Fed. R. Evid. 804(b)(6)). The Court noted that

9

"[e]very commentator [it] [was] aware of has concluded the requirement of intent 'means that the exception applies only if the defendant has in mind the particular purpose of making the witness unavailable.'" *Id.* at 367 (quoting 5 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 8.134 (3d ed. 2007)).

¶27.   Here, the record reflects that sufficient evidence was presented to show that Jones conspired to kill the Loves and that Keys's murder was in furtherance and within the scope of that conspiracy and reasonably foreseeable to Jones. *Cherry*, 217 F.3d at 820. Thus, Holland's and Buchanan's actions in Keys's death can be imputed to Jones, thereby waiving Jones's Confrontation Clause rights. *Id.* at 818, 820. Indeed, the record reflects that Jones "ha[d] in mind the particular purpose of making [Keys] unavailable." *Giles*, 554 U.S. at 367 (internal quotation mark omitted) (quoting Mueller & Kilpatrick, *supra*, at § 8.134).

¶28.   In his statement, Keys explained that on the night of the shooting, he was with Jones, Holland, McClung, and Buchanan at Holland's house. According to Keys, days earlier Jones had stated that he needed to "get one" of the Loves because they had "got some of their friends."[2] The group decided to go to the Moroccan Lounge in Itta Bena, and all five men got into Keys's Tahoe. Keys stated that Jones had his "short" AK-47 assault rifle with him when they left Holland's house.

¶29.   On their way to the club, Keys was driving, Jones and Holland were on the passenger side of the vehicle, McClung was in the back seat on the driver's side, and Buchanan was in the third-row seat. While traveling on Highway 82, they approached a red Pontiac. Jones

---

[2] According to Keys, the Loves had recently shot two of their friends.

mentioned that it looked like the Loves in the vehicle. As they approached the vehicle, Jones rolled down the window, leaned out the window, and opened fire. As soon as Jones started shooting, he yelled, "go, go, go," and Keys sped up to get away.

¶30.   After the shooting, Keys stated that Holland made a phone call and arranged for them to swap cars. After they had swapped cars, they went to a Best Western hotel in Greenwood and got a room. Jones brought his gun into the hotel room. Later, Jones and Holland left together. According to Keys, Jones returned around 3:00 or 4:00 a.m., and he no longer had his gun.

¶31.   Keys, Jones, Buchanan, and McClung spent the night at the Best Western. The next morning, Jones arranged his own ride home; Keys, McClung, and Buchanan all got a ride together. Keys was dropped off first.

¶32.   Keys explained that when he woke up at the hotel that morning, he had a number of missed calls. He called his mother and learned that the sheriff was looking for him. Keys told his mother that something had happened, but he did not tell her the details. Keys stayed with his mother for several days after the shooting until he retained counsel and turned himself in. At the time Keys gave his statement, he had not spoken with anyone else who had been involved in the shooting.

¶33.   Jones asserts that because the victims were traveling in a borrowed vehicle[3] at the time of the shooting, there could be no plan or conspiracy to shoot or kill them. He further asserts that Keys's statement contradicts a conspiracy to shoot or harm the Loves. But the record

_____

[3] Bentravious "Munchie" Brown testified that on the night of the shooting, he loaned his red Pontiac to Perez Love.

11

reflects that the shooting was not a random act. Instead, it shows that Jones planned and conspired to shoot the Loves out of revenge for their recently having shot two of his friends. The fact that the victims were in a borrowed vehicle is irrelevant. Indeed, the record shows that as they approached the borrowed vehicle, Jones stated that it looked like the Loves in the car. Jones then opened fire on the Loves. While Keys did not indicate that there was a plan to kill the Loves, he stated that Jones had said just days earlier that he wanted to "get" the Loves because of what they had done to their friends.

¶34. Additionally, although Keys stated that no one else had a gun except for Jones, two of the surviving victims testified that both Jones and Holland had shot at them and that Holland had used a .40-caliber pistol. A .40-caliber shell casing was recovered from the scene, and a .40-caliber bullet was recovered from Perez Love's head.[4] Thus, the record reflects that on the night of the shooting, upon leaving Holland's house, both Jones and Holland were armed with guns and used those guns to shoot the Loves.

¶35. After giving his statement, Keys went to Jones's lawyer and advised that he had given a statement to law enforcement. Each defendant was provided a copy of Keys's statement early in the case. Approximately five months after the men were indicted, Keys was shot and killed. The surveillance video shows Holland chasing Keys through a parking lot—while carrying a gun—moments before Keys was shot and killed. Although other people appeared on the video, and even chased behind Keys and Holland, Holland was the only person with a gun. The surveillance video further shows Buchanan acting as a lookout.

---

[4] Expert testimony showed that the .40-caliber bullet was not fired from the two pistols found in the Pontiac.

12

¶36. Jones asserts that "[d]ue to his incarceration, it would have been impossible for [him] to have [had] any involvement with . . . Keys's death." We disagree. The fact that Jones was in jail at the time of Keys's murder is of no consequence. *Pinkerton*, 328 U.S. 640, 647-48; *see also* ***United States v. Dinkins***, 691 F.3d 358, 384 (4th Cir. 2012) (rejecting the argument that the forfeiture-by-wrongdoing exception should not apply to a defendant who was in jail at the time the witness was murdered). The record reflects that after Keys's murder, Holland received a text message from Buchanan on Jones's cell phone. This communication indicates that the men remained in contact even though Jones was incarcerated. Moreover, Keys himself went to Jones's attorney in an attempt to explain why he had given a statement to law enforcement. It is certainly probable and more likely than not that Jones's attorney advised Jones of Keys's statement. Keys's statement implicates Jones in the murder and attempted murders. After Jones learned that Keys had provided the statement, Keys was killed, and two of Jones's codefendants, Holland and Buchanan, were involved in Keys's death.

¶37. As noted in the separate opinion, "[c]onspiracy is a combination of two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose unlawfully, the persons agreeing in order to form the conspiracy." CIPR Op. ¶ 75 (internal quotation marks omitted) (quoting Mississippi Code Section 97-1-1 (Rev. 2020)). The separate opinion acknowledges that "the evidence does suggest a combination to accomplish an unlawful purpose" but asserts that "the evidence does not show a measurable degree of planning or sophistication." CIPR Op. ¶ 75. It contends that "the conspiracy to victimize the

13

Loves was far from an ongoing, sophisticated criminal enterprise . . . ." CIPR Op. ¶ 80. But the agreement or plan "need not be formal or express, but *may be inferred from the circumstances*, particularly by declarations, acts, and conduct of the alleged conspirators." *Hervey v. State*, 764 So. 2d 457, 461 (Miss. Ct. App. 2000) (internal quotation mark omitted) (quoting *Griffin v. State*, 480 So. 2d 1124, 1126 (Miss. 1985)). Based on the circumstances, particularly the declarations, acts, and conduct of Jones and Holland, sufficient evidence exists to show an agreement to "get," meaning to murder, the Loves.

¶38. The separate opinion further asserts "[t]he facts are insufficient to support a finding by a preponderance of the evidence that the original conspiracy to harm the Loves extended to the slaying of Keys" because the "slaying of Keys . . . occurred a year and a half later." CIPR Op. ¶ 77. But the "slaying of Keys" occurred only five months after the men were indicted for the shooting. In other words, within five months of Jones's being formally charged with murder and attempted murder, and knowing that Keys's statement facilitated the indictment and implicated Jones in the charges, Keys was killed. Two of the main suspects in Keys's death, Holland and Buchanan, remained in contact with Jones, despite Jones's incarceration, texting Jones shortly after Keys's death.

¶39. We find sufficient evidence was presented to show that Jones was part of an original conspiracy to "get" the Loves. We further find sufficient evidence was presented to show that Keys was killed to prevent his testimony. Indeed, Jones "ha[d] in mind the particular purpose of making the witness unavailable." *Giles*, 554 U.S. at 367 (the forfeiture-by-wrongdoing exception applies if "the defendant has in mind the particular purpose of making

14

the witness unavailable" (quoting Mueller & Kirkpatrick, *supra*, at § 8.134)).  Even one of

the individuals on the surveillance video stated that Keys "got what he deserved because he

turned State's evidence."  Keys's murder was an act in furtherance and within the scope of

the original conspiracy.  ***Cherry***, 217 F.3d at 820.  Additionally, as properly noted by the

Court of Appeals,

> evidence in the record supports the trial court's finding that Keys's murder was
> foreseeable to Jones, particularly in the light of the violent conduct Jones had
> already engaged in with respect to his actions on the night of the Love
> shooting. *Cf.* ***Thompson***, 286 F.3d at 966 (finding that co-conspirator
> informant's murder was not reasonably foreseeable where there was no
> evidence that defendants, as part of their drug conspiracy, had previously
> engaged in murder or attempted murder).  We therefore find no error in the
> trial court's decision to allow Keys's statement against Jones at trial [under
> Rule 804(b)(6)].

***Buchanan***, 2019 WL 6490737, at *12.[5]

¶40.    Jones last asserts that "but for the improperly admitted testimony contained in . . .

Keys's statement, [he] could not have been found guilty beyond a reasonable doubt."  We

---

[5] The separate opinion asserts that the Court of Appeals' decision in this case conflicts with its decision in ***McClung v. State***, 294 So. 3d 1216 (Miss. Ct. App. 2019). CIPR Op. ¶ 81.  In ***McClung***, the Court of Appeals found that the forfeiture-by-wrongdoing exception did not apply to McClung and, as a result, Keys's statement should not have been admitted against him. ***McClung***, 294 So. 3d at 1228, 1230.  According to the separate opinion, "the evidence on forfeiture by wrongdoing was not distinguishable in any material way from the evidence against Jones." CIPR Op. ¶ 81.  We disagree.  Unlike Jones, there was no evidence other than Keys's statement that McClung was involved in the murder or attempted murder of the Loves, Jennings, and Stigler.  Neither the surviving victims nor Jasmin Cage, Perez Love's girlfriend identified McClung or put him at the scene on the night of the shooting.  The only reference to McClung in Keys's statement was that McClung was with them in the Tahoe at the time of the shooting and sat in the back seat on the driver's side.  There was no evidence that McClung was armed or that he shot at the Loves, Jennings, or Stigler.  Additionally, there was no evidence that McClung was involved in Keys's death or communicated with Jones, Holland, and/or Buchanan after Keys's death.

disagree. Even without Keys's statement, sufficient evidence was presented to support Jones's convictions of murder and attempted murder.

¶41. After the shooting, while officers were on the scene, Jasmine Cage approached and advised that she knew the victims. One of the victims, Perez Love, was Cage's boyfriend. Cage explained that on the night of the shooting, she was on her way to Itta Bena to "make sure that [Perez] was not going to the club." She testified that there were not many cars on the highway but that she saw the red Pontiac and she also saw a truck—a Yukon or Tahoe.

¶42. Cage testified that she could not remember the color of the truck nor could she see anyone inside the vehicle. But in an earlier statement given to law enforcement, Cage had identified the color of the vehicle and the individuals in the vehicle. After refreshing her recollection, Cage acknowledged that she had previously told law enforcement that the vehicle was gold and that she saw Keys, Jones, Holland, and David Reedy[6] in the vehicle. She advised that Jones was riding in the front passenger seat and that Holland was in the backseat on the passenger's side. Cage explained that after the gold Yukon or Tahoe passed her, she saw "sparks like fire."

¶43. In addition to Cage's identification, two of the surviving victims of the shooting—Ken Norris Stigler and Perez Love—testified that Jones and Holland were the ones who fired shots at them and their car.[7] Stigler and Perez Love confirmed that the shooters had traveled

---

[6] The record reflects that Reedy was not in the vehicle at the time of the shooting. Cage explained that she thought Reedy was in the Tahoe that night because he formerly owned the vehicle. She was unaware that Keys had taken over the payments.

[7] The other surviving victim, Kelsey Jennings, testified that he did not see the shooters or the car in which they traveled.

16

in a beige or gold Tahoe-type vehicle. Perez Love stated that Jones used a "baby assault rifle." Both Perez and Stigler stated that Holland used a .40-caliber pistol. Hathcock, the State's firearms and toolmarks identification expert, opined that the 7.62 mm shell casings that were recovered from the highway could have been fired from an AK-47, a semiautomatic assault rifle.[8] And as previously noted, a .40-caliber bullet was recovered from Perez Love's head.

¶44. Stigler testified that he specifically saw Jones shoot Perez Love in the top of the head, and he stated that even after Perez was shot, Jones and Holland continued shooting. Like Cage, Stigler testified that Jones was riding in the front passenger seat and that Holland was in the back seat on the passenger side.

¶45. We do not find that the trial court erred by admitting Keys's statement into evidence under Rule 804(b)(6). But even without the admission of Keys's statement, sufficient evidence supports Jones's convictions of murder and attempted murder. Accordingly, his convictions are affirmed.

### B. Exclusion of Keys's Statement as Self-Serving

¶46. Jones further argues that Keys's statement should have been excluded as self-serving. For support, Jones relies on *Simmons v. State*, 805 So. 2d 452, 489 (Miss. 2001). In *Simmons*, this Court noted that "[o]ur caselaw states that *the defendant* is barred from introducing a statement made by the defendant immediately after the crime, if it is self-serving, and if the State refuses to use any of it." *Id.* (emphasis added) (internal

---

[8] Hathcock was unable to determine whether the shell casings were fired from the AK-47 assault rifle used by Jones because Jones's weapon was never recovered.

quotation marks omitted) (quoting *Nicholson ex rel. Gollott v. State*, 672 So. 2d 744, 754 (Miss. 1996)). Generally, "declarations of a party in his own favor are not admissible [o]n his behalf." *Id.* (internal quotation mark omitted) (quoting *Shorter v. State*, 257 So. 2d 236, 240 (Miss. 1972)). "A self-serving declaration is excluded because there is nothing to guarantee its trustworthiness." *Id.* (emphasis omitted) (quoting *Wilson v. State*, 451 So. 2d 718, 721 (Miss. 1984)).

¶47. Here, as the Court of Appeals properly noted, the State, not the defendant, introduced Keys's statement. *Buchanan*, 2019 WL 6490737, at *12. Thus, *Simmons* is inapplicable.

**II. Sedrick Buchanan**

¶48. Like Jones, Buchanan argues that the trial court erroneously admitted Keys's videotaped statement under Rule 804(b)(6). But Buchanan also asserts two additional arguments: (1) the trial court erroneously admitted evidence regarding a .40-caliber pistol recovered during his postshooting arrest, and (2) insufficient evidence supports his convictions of aggravated assault. We start with whether sufficient evidence supports Buchanan's convictions.

¶49. "This Court reviews de novo a trial court's ruling on the legal sufficiency of the evidence." *Haynes v. State*, 250 So. 3d 1241, 1244 (Miss. 2018) (citing *Brooks v. State*, 203 So. 3d 1134, 1137 (Miss. 2016)). "When reviewing a case for sufficiency of the evidence, '[a]ll credible evidence [that] is consistent with guilt must be accepted as true, and the State is given the benefit of all favorable inferences that may be reasonably drawn from the evidence.'" *Id.* (alterations in original) (internal quotation marks omitted) (quoting *Burrows*

18

*v. State*, 961 So. 2d 701, 705 (Miss. 2007)). "We examine the evidence in the light most favorable to the State, while keeping in mind the beyond-a-reasonable-doubt burden of proof standard." *Id.* (citing *Dees v. State*, 126 So. 3d 21, 26 (Miss. 2013)). This burden must be satisfied with evidence, not speculation or conjecture. *Edwards v. State*, 469 So. 2d 68, 69-70 (Miss. 1985); *Sisk v. State*, 294 So. 2d 472, 475 (Miss. 1974). "Should the facts and inferences . . . 'point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty,' the proper remedy is for the appellate court to reverse and render." *Haynes*, 250 So. 3d at 1244 (internal quotation marks omitted) (quoting *Brown v. State*, 965 So. 2d 1023, 1030 (Miss. 2007)).

¶50.   Buchanan was convicted of three counts of aggravated assault. In order to find Buchanan guilty of aggravated assault, there must be evidence beyond a reasonable doubt that Buchanan "attempt[ed] to cause serious bodily injury to another, or cause[d] such injury purposely, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life" or that he "attempt[ed] to cause or purposely or knowingly cause[d] bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm[.]" Miss. Code Ann. § 97-3-7(2)(a)(i)-(ii) (Rev. 2020).

¶51.   Under Mississippi law, "a person who acts in 'confederation' with others to violate a law is liable as a principal under either the theory of conspiracy or the theory of aiding and abetting." *Adams v. State*, 726 So. 2d 1275, 1279 (Miss. Ct. App. 1998) (quoting *Shedd v. State*, 228 Miss. 381, 87 So. 2d 898, 899 (1956)). "One who aids and abets another in the

19

commission of a crime is guilty as a principal." *Hughes v. State*, 983 So. 2d 270, 276 (Miss. 2008) (citing *Rubenstein v. State*, 941 So. 2d 735, 773 n.18 (Miss. 2006)). "To aid and abet the commission of a felony, one must 'do something that will incite, encourage, or assist the actual perpetrator in the commission of the crime . . . [or] participate[] in the design of the felony.'" *Id.* (alterations in original) (internal quotation marks omitted) (quoting *Vaughn v. State*, 712 So. 2d 721, 724 (Miss. 1998)). We do "not recognize guilt by association." *Id.* (citing *Davis v. State*, 586 So. 2d 817, 821 (Miss. 1991)).

¶52. The Court of Appeals found that Buchanan's presence at Holland's house before the shooting and his presence in the Tahoe at the time of the shooting support his convictions. *Buchanan*, 2019 WL 6490737, at *19. But none of the eyewitnesses identified Buchanan as a passenger in the Tahoe. Indeed, neither Cage nor Stigler or Perez Love identified Buchanan as a passenger in the vehicle at the time of the shooting. The only evidence against Buchanan was Keys's statement.[9] But as Judge Wilson noted in his separate opinion, "during his approximately forty-three-minute statement, Keys said little about Buchanan and nothing to implicate him as an aider and abettor in the shooting. Keys stated only that Buchanan was sitting in the third-row seat of the Tahoe when the shooting occurred." *Id.* at *25 (J. Wilson, P.J., concurring in part and dissenting in part). Such evidence "establishes only [Buchanan's] presence at the scene of the crime." *Id.* at *25 (J. Wilson, P.J., concurring in part and dissenting in part).

---

[9] We do not address Buchanan's challenge to the admission of Keys's statement because even with the statement, the evidence is insufficient to support Buchanan's convictions of aggravated assault.

20

¶53. According to Keys, a few days before the shooting, Jones stated that he needed to get the Loves because they had shot two of their friends. The Court of Appeals relied on this prior conversation as evidence against Buchanan. *Id.* at *19. But no evidence was presented that Buchanan was privy to that conversation or knew anything about Jones's intentions.

¶54. The Court of Appeals further found that Buchanan's convictions were supported by (1) his physical proximity to a .40-caliber pistol six months after the shooting and (2) the fact that he "made no attempt to leave the group" after the shooting. *Id.* at *19-20. But neither of these facts supports a reasonable inference that Buchanan aided and abetted the shooting.

¶55. First, the evidence shows that the .40-caliber pistol was owned by and registered to Danarius Jackson, and it was found in the center console of Jackson's car six months after the shooting. The State's ballistics expert could only testify that "due to insufficient reproducible characteristics the [.40-caliber] cartridge casing [found at the crime scene] could not be positively included or excluded as having been fired from [Jackson's] gun." As noted by Judge Wilson,

> [t]he only tenuous connection between the gun and anyone or anything in this case is that Buchanan happened to be in Jackson's car when he was arrested on unrelated charges in Carroll County—*six months* after the shooting and *five months* after Buchanan had turned himself in on the charges in this case. Moreover, there is no suggestion that Buchanan was one of the shooters in this case, nor is there any evidence that Buchanan ever possessed the pistol that Holland used. In short, there is no evidence that Jackson's gun was used in the shooting or that Buchanan ever had possession of it. All we know is that six months after the shooting Buchanan was sitting in a car with a man who had a .40-caliber handgun. A jury would have to pile speculation upon conjecture to find that Buchanan provided Jackson's gun to Jones to shoot at the Loves.

*Id.* at *25 (J. Wilson, P.J., concurring in part and dissenting in part) (footnote omitted).

21

¶56.   Second, the fact that Buchanan made no attempt to leave the group after the shooting is insufficient to establish beyond a reasonable doubt that he encouraged or assisted Jones or Holland prior to or during the shooting. "An 'attempt to leave' a murderous group can be a risky proposition. It would be speculation and conjecture to say that Buchanan must have somehow encouraged or assisted in the crime just because he 'made no attempt to leave' afterward." *Id.* at \*26 (J. Wilson, P.J., concurring in part and dissenting in part). Moreover, Buchanan's failure to leave the group *after* the shooting does not shed light on what he knew *before* the shooting.

¶57.   As previously discussed, none of the eyewitnesses to the shooting identified Buchanan as the shooter. Although Keys stated that Buchanan was in the very back of the Tahoe, his statement only briefly mentions Buchanan and does not reference anything that Buchanan did or said to aid or abet the shooting. Accordingly, we find there is insufficient evidence to support Buchanan's convictions of aggravated assault. We therefore reverse the trial court's judgment of conviction and render a judgment of acquittal on the three counts against Buchanan.[10]

## **CONCLUSION**

¶58.   The judgment of the Court of Appeals is affirmed in part and reversed and rendered in part. As to the judgment of the Circuit Court of Leflore County, we affirm Jones's convictions of first-degree murder and attempted first-degree murder; we reverse Buchanan's convictions of aggravated assault and render a judgment of acquittal as to Buchanan.

---

[10] Because Buchanan's insufficiency-of-the-evidence argument is dispositive, we decline to address the remaining issues asserted in his petition for certiorari.

¶59.    **AFFIRMED IN PART; REVERSED AND RENDERED IN PART.**

**RANDOLPH, C.J., COLEMAN, MAXWELL, BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR. KITCHENS, P.J., CONCURS IN PART AND IN RESULT WITH SEPARATE WRITTEN OPINION JOINED BY KING, P.J.; ISHEE, J., JOINS IN PART.**

**KITCHENS, PRESIDING JUSTICE, CONCURRING IN PART AND IN RESULT:**

¶60.    Because the trial court's admission of Jacarius Keys's statement under the hearsay exception for forfeiture by wrongdoing was harmless beyond a reasonable doubt, I agree that this Court should affirm Armand Jones's convictions. Although the right result is to affirm, this case does present an issue of first impression: whether Keys's statement was admissible against Jones under the forfeiture by wrongdoing exception to the hearsay rule and the Confrontation Clause of the Sixth Amendment. Citing federal case law that has been applied to organized crime, the majority adopts a doubtful test which it then applies in an overly broad manner, finding that Jones forfeited his right to confrontation because he was responsible for the death of Keys under a theory of ***Pinkerton***[11] liability for coconspirators. But no evidence shows that Jones had any foreknowledge of or involvement in the scheme concocted by others to slay Keys. Moreover, the original conspiracy amongst Jones, Keys, and others to harm D'Alandis and Perez Love did not reasonably encompass Keys's homicide, and it was not reasonably foreseeable. I would hold that the trial court erred by admitting Keys's statement against Jones but that the error was harmless. I respectfully concur in part and in the result with the majority's decision to affirm Jones's conviction. I

_____

[11] ***Pinkerton v. United States***, 328 U.S. 640, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946).

concur with the majority's decision to reverse and render a judgment of acquittal as to Sedrick Buchanan.

### A. Facts

¶61. As related in the majority opinion, Jones, Keys, Sedrick Buchanan, Michael Holland, and James Earl McClung, Jr., each was indicted for one count of first degree murder and three counts of attempted first degree murder in connection with a drive-by shooting incident in Itta Bena, Mississippi. The incident occurred on August 15, 2015. On that day, D'Alandis Love, Perez Love, Kelsey Jennings, and Ken-Norris Stigler were traveling west on Highway 82 in a red Pontiac car. Suddenly, a gold Chevrolet Tahoe vehicle overtook them, and its occupants began shooting at the red Pontiac. D'Alandis Love was killed, and Perez Love, Jennings, and Stigler sustained gunshot wounds.

¶62. Keys gave a videotaped statement to the police that implicated Jones, Holland, Buchanan, and McClung. In the statement, Keys said that, several days before the shooting, Jones had told the others that he needed to "get one" of the Loves in retaliation for the Loves' having hurt their friends. On the day of the shooting, Keys was driving the group to a bar in Itta Bena when they spotted the red Pontiac with the Loves inside. According to Keys, Jones had an AK-47 assault rifle and, when the Tahoe was abreast of the Pontiac, Jones rolled down the window and began shooting at the Pontiac's occupants. Victims Perez Love and Stigler provided corroboration by testifying that they had witnessed Jones shooting at them with "a baby assault rifle." Stigler said that he saw Jones shooting at them and that he saw Jones shoot Perez Love in the back of the head. Both testified also that Holland had shot at

24

them with a .40 caliber pistol.[12] Keys said that, after the shooting, the group took measures to conceal the crime, including arranging to swap cars, disposing of Jones's gun, and spending the night in a hotel. The next day, Keys learned that the sheriff was looking for him, so he retained counsel, turned himself in, and gave a videotaped statement to the police. Each of the four defendants—Jones, Holland, Buchanan, and McClung—received a copy of Keys's statement.

¶63. Approximately one and a half years after the drive-by shooting, Keys was killed. Jones was incarcerated at the time. A surveillance video implicated several suspects in Keys's slaying. In particular, it showed Holland carrying a gun and chasing after Keys while Buchanan acted as a lookout. One of the other suspects who was present during Keys's homicide, Anthony Flowers, told the police that Keys "got what he deserved because he turned State's evidence."

¶64. Jones, Holland, Buchanan, and McClung, who were indicted and tried together for the drive-by shooting, filed a pretrial motion to exclude Keys's statement on hearsay and Confrontation Clause grounds. The trial court denied the motion and admitted Keys's statement. On appeal, the Court of Appeals found that Keys's statement was admissible against Jones under exceptions to the hearsay rule and to the right to confrontation that apply to a defendant's forfeiture by wrongdoing. According to the Court of Appeals, the statement was admissible against Jones because "Jones is liable for 'acquiescing' in procuring Keys's

---

[12] Perez Love testified that he was shot once in the head. Because a .40 caliber bullet was removed from his head wound, it actually was Holland, not Jones, who had shot him. But both Perez Love and Stigler testified that they had seen Jones and Holland shooting at them from the Tahoe.

unavailability under the conspiratorial responsibility theory announced in *United States v. Cherry*, 217 F.3d 811 (10th Cir. 2000)." *Buchanan v. State*, No. 2017-KA-01082-COA, 2019 WL 6490737, at *10 (Miss. Ct. App. Dec. 3, 2019). The majority adopts the reasoning of the Court of Appeals, with which I disagree.

        B.       *The Confrontation Clause*

¶65.    A trial court's discretionary ruling to admit or exclude evidence is reviewed for abuse of discretion, but constitutional issues are reviewed *de novo*. *Armstead v. State*, 196 So. 3d 913, 916 (Miss. 2016) (citing *Williams v. State*, 991 So. 2d 593, 597 (Miss. 2008); *Smith v. State*, 25 So. 3d 264, 267 (Miss. 2009)). Jones challenges the admission of Keys's statement against him under the confrontation clauses of the United States Constitution and the Mississippi Constitution, which guarantee a criminal defendant the right to confront the witnesses against him. U.S.Const. amend. VI; U.S. Const. amend XIV; Miss. Const. art. 3, § 26. In *Crawford v. Washington*, the United States Supreme Court held that "the testimonial statements of a witness who does not testify at trial are inadmissible unless the witness is unavailable and the defendant had a prior opportunity for cross-examination." *Conners v. State*, 92 So. 3d 676, 683 (Miss. 2012) (citing *Crawford v. Washington*, 541 U.S. 36, 51, 124 S. Ct. 1354, 1364, 158 L. Ed. 2d 177 (2004)). *Crawford* overruled *Ohio v. Roberts*, 448 U.S. 56, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980), "insofar as it stood for the proposition that the admissibility of hearsay evidence depends upon whether 'it falls under a "firmly rooted hearsay exception" or bears "particularized guarantees of trustworthiness."'" *Birkhead v. State*, 57 So. 3d 1223, 1234 n.11 (Miss. 2011) (citing *Crawford*, 541 U.S. at 60, 67-68

26

(quoting **Roberts**, 448 U.S. at 66)).

¶66.    Keys's statement to the police was testimonial hearsay and subject to exclusion under the state and federal confrontation clauses. The majority finds that the statement was admissible against Jones under the forfeiture by wrongdoing exception to the right to confrontation. Under that exception, "one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation." **Davis v. Washington**, 547 U.S. 813, 833, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006). This is because "when defendants seek to undermine the judicial process by procuring or coercing silence from witnesses and victims, the Sixth Amendment does not require courts to acquiesce." **Id.** Mississippi Rule of Evidence 804(b)(6) provides an exception to hearsay for forfeiture by wrongdoing that permits the admission of "[a] statement offered against a party that wrongfully caused—or acquiesced in wrongfully causing—the declarant's unavailability as a witness, and did so intending that result." MRE 804(b)(6). When the Confrontation Clause applies, Rule 804(b)(6) is applied coextensively with the exception to the confrontation right for waiver by misconduct. **Cherry**, 217 F.3d at 816. A party seeking admission of hearsay under the forfeiture by wrongdoing exception must make the requisite showing by a preponderance of the evidence. **United States v. Gurrola**, 898 F.3d 524, 534 (5th Cir. 2018).

        C.      The **Cherry** Test

¶67.    Jones argues that the State failed to show by a preponderance of the evidence that he procured Keys's absence because nothing shows that Jones had anything to do with the plot by Holland, Buchanan, and others to kill Keys. Like the Court of Appeals, the majority relies

27

on *Cherry* and finds that Jones's argument is without merit. *Cherry* applied the *Pinkerton* rule of conspiratorial liability to determine whether a defendant had waived confrontation and hearsay objections. *Cherry*, 217 F.3d at 820. In *Cherry*, five codefendants objected to the admission of a statement from one of the government's witnesses, Ebon Sekou Lurks, who was killed before the trial. *Id.* at 813. The district court had admitted the statement against one of the defendants who had participated in Lurks's killing but excluded it from the trial of three defendants who had lacked knowledge of Lurks's homicide and who had not agreed to or participated in it. *Id.* at 814.

¶68.     On appeal, the United States Court of Appeals for the Tenth Circuit reversed. *Id.* at 821. The court reviewed "whether Rule 804(b)(6) and the Confrontation Clause permit a finding of waiver based not on direct procurement but rather on involvement in a conspiracy, one of the members of which wrongfully procured a witness's unavailability." *Id.* at 815. The court found that the words "engaged or acquiesced in wrongdoing" in Rule 804(b)(6) supported the argument "that, at least for purposes of the hearsay rules, waiver can be imputed under an agency theory of responsibility to a defendant who 'acquiesced' in the wrongful procurement of a witness's unavailability but did not actually 'engage[]' in wrongdoing apart from the conspiracy itself." *Id.* (alteration in original) (internal quotation marks omitted) (quoting Fed. R. Evid. 804(b)(6)). The court found that *Pinkerton* conspiratorial liability, under which "[t]he overt act of one partner in crime is attributable to all," *id.* at 816 (quoting *Pinkerton*, 328 U.S. at 647), applied to determinations of forfeiture by wrongdoing and crafted a rule that

28

[a] defendant may be deemed to have waived his or her Confrontation Clause rights (and, a fortiori, hearsay objections) if a preponderance of the evidence establishes one of the following circumstances: (1) he or she participated directly in planning or procuring the declarant's unavailability through wrongdoing; or (2) the wrongful procurement was in furtherance, within the scope, and reasonably foreseeable as a necessary or natural consequence of an ongoing conspiracy.

*Id.* at 820 (citations omitted). The court remanded for the district court to apply the new test. *Id.* at 821.

¶69.    I note that *Cherry* did not craft a completely open-ended conspiratorial liability test for admissibility under the forfeiture by wrongdoing exception. *Cherry* recognized that due process places limits on *Pinkerton* liability. "[M]ere participation in a conspiracy does not suffice[.]" *Id.* at 820. And *Cherry* acknowledged that a conspirator's liability for the acts of coconspirators ends when the "conspiracy accomplished its goals or that conspirator withdraws." *Id.* at 817 (internal quotation mark omitted) (quoting *United States v. Brewer*, 983 F.2d 181, 185 (10th Cir. 1993)). Under *Cherry*, if one coconspirator procured the unavailability of a witness, the witness's prior unconfronted statement is admissible against coconspirators who had no knowledge of or involvement in procuring the witness's absence if, and only if, the wrongful procurement was in furtherance of the conspiracy, within its scope, and reasonably foreseeable as a necessary and natural consequence of an ongoing conspiracy. *Id.* at 820.

¶70.    The problem with this Court's adoption of *Cherry* is that the decision stands on shaky ground. First and foremost, *Cherry* was decided in 2000, before the Supreme Court's 2004 decision in *Crawford* that changed the landscape of Confrontation Clause jurisprudence.

Additionally, in another post-*Cherry* decision, the United States Supreme Court narrowed the confrontation right's forfeiture by wrongdoing exception. *Giles v. California*, 554 U.S. 353, 359, 128 S. Ct. 2678, 2683, 171 L. Ed. 2d 488 (2008). *Giles* reaffirmed *Crawford*'s holding that exceptions to the confrontation right are limited to those in effect at the time of the founding. *Id.* at 358. After determining which exceptions were established law at the founding, *Giles* held that forfeiture by wrongdoing applies only when the defendant "engaged in conduct *designed* to prevent the witness from testifying." *Id.* at 359.

¶71.　Because *Cherry* was decided before *Crawford* and *Giles*, its continuing viability is in question. The majority not only relies on *Cherry*, but it relies also on another pre-*Crawford* and *Giles* decision that applied *Cherry*, *United States v. Thompson*, 286 F.3d 950 (7th Cir. 2002). In *Thompson*, the United States Court of Appeals for the Seventh Circuit adopted the *Cherry* test and used it to determine whether hearsay statements were admissible against coconspirators under the forfeiture by wrongdoing exception. *Id.* at 963-66. But in a 2020 decision, the Seventh Circuit reexamined *Thompson* in light of *Crawford* and *Giles*. *United States v. Brown*, 973 F.3d 667, 699-701 (7th Cir. 2020). The circuit court recognized that *Pinkerton* liability, under which "a person is liable for an offense committed by a coconspirator when its commission is reasonably foreseeable to that person and is in furtherance of the conspiracy[,]" is a relatively new concept. *Id.* (citing *Pinkerton*, 328 U.S. at 647). The circuit court found that *Pinkerton* liability was not a recognized legal concept at common law or at the time of the founding. "In the 18th century, criminal liability was generally limited to those who acted as principals or those who aided and abetted." *Id.* at 701.

The Seventh Circuit said that "[u]nder a strict reading of *Crawford* and *Giles*, it seems that *Thompson* may no longer be good law." *Id.* But the circuit court declined to answer that question because it found that the admission of the hearsay statements against the defendant had been harmless beyond a reasonable doubt. *Id.*

¶72.    As discussed in *Brown*, the decisions of the United States Supreme Court in *Crawford* and *Giles* have cast *Cherry* into doubt. For that reason, this Court should not adopt *Cherry*.

D.    *The evidence adduced by the State fails the* **Cherry** *test.*

¶73.    Even applying the *Cherry* test, Keys's statement should not have been admitted against Jones. It is undisputed that Jones did not "participate[] directly in planning or procuring [Keys's] unavailability through wrongdoing . . . ." *Cherry*, 217 F.3d at 820. To be clear, no one advocates and no evidence exists that Jones was aware of or participated in any way in an agreement between Holland, Buchanan, and others to murder Keys. Jones was not a suspect in Keys's homicide. He was in jail at the time of Keys's death. Because Keys had told Jones's defense attorney that he had talked to the police, Jones, like Holland, Buchanan, and McClung, likely knew that Keys had given a statement to the investigating authorities. After Keys's murder, when Buchanan was incarcerated at the same facility as Jones, Holland received a text message from Buchanan that had come from Jones's cell phone. The text said, "hey, this is Sed." Nothing indicated that the text related to Keys's murder.

¶74.    Because Jones did not directly participate in killing Keys, the question is whether "the wrongful procurement [of Keys's absence by others] was in furtherance, within the scope, and reasonably foreseeable as a necessary or natural consequence of an ongoing conspiracy."

31

*Cherry*, 217 F.3d at 820 (citation omitted). The majority finds that the actions of Holland and Buchanan can be imputed to Jones because Keys's homicide was in furtherance of the original conspiracy amongst Jones, Holland, Buchanan, Keys, and McClung to "get" the Loves, was within the scope of that conspiracy, and was reasonably foreseeable to Jones.

¶75.　The majority's logic fails on several levels. The agreement to harm the Loves was not an "ongoing conspiracy" as required by *Cherry*. "Conspiracy is a combination of two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose unlawfully, the persons agreeing in order to form the conspiracy." Miss. Code Ann. § 97-1-1 (Rev. 2020). None of the defendants charged with involvement in the drive-by shooting was indicted for conspiracy. The evidence supporting the existence of a conspiracy consisted of Jones's having told the others that he wanted to "get" the Loves, and then when the group saw the Loves' vehicle, they decided to pass the Loves' car, roll down the car windows, and open fire. Testimony established that Jones routinely carried the weapon he used in the shooting, which evinces spontaneity. Although the evidence does suggest a combination to accomplish an unlawful purpose, the evidence does not show a measurable degree of planning or sophistication. Nor does the evidence show that the conspiracy had any goal beyond "getting" the Loves. Once that limited goal was accomplished, the conspiracy was at an end. *Cherry*, 217 F.3d at 817.

¶76.　The majority finds that the conspiracy to "get" the Loves included the slaying of Keys because a conspiracy "can also include secondary goals relevant to the evasion of apprehension and prosecution for that goal—such as escape, or, by analogy, obstruction of

justice." Maj. Op. at ¶ 24 (internal quotation mark omitted) (quoting *Cherry*, 217 F.3d at

821). But the United States Supreme Court has held that

> after the central criminal purposes of a conspiracy have been attained, a subsidiary conspiracy to conceal may not be implied from circumstantial evidence showing merely that the conspiracy was kept a secret and that the conspirators took care to cover up their crime in order to escape detection and punishment.

*Grunewald v. United States*, 353 U.S. 391, 401, 77 S. Ct. 963, 1 L. Ed. 2d 931 (1957). Under

*Grunewald*, "efforts to conceal a conspiracy are not automatically a part of the conspiracy."

*United States v. Masters*, 924 F.2d 1362 (7th Cir. 1991). Therefore, although a conspiracy

*can* include secondary goals of concealment, a conspiracy does not *automatically* include

concealment as one of its goals. Rather, the facts must establish sufficiently that the

conspiracy included a secondary agreement to cover up the crime.

¶77.    The facts are insufficient to support a finding by a preponderance of the evidence that

the original conspiracy to harm the Loves extended to the slaying of Keys. Certainly, Jones,

Holland, McClung, Keys, and Buchanan took steps on the night of the drive-by shooting to

conceal the crime, including swapping the Tahoe for another car, getting rid of weapons, and

staying in a hotel. But all of those efforts occurred in the immediate aftermath of the

shooting. The slaying of Keys by Holland, Buchanan, and others occurred a year and a half

later. Keys's murder was too attenuated in time and too distinct from the original

conspiracy's goal of "getting" the Loves to have been within the scope of the original

conspiracy. That conspiracy had ended and was not still ongoing a year and a half later.

¶78.    The majority asserts that the timing of the original coconspirators' indictments, five

months before Keys's killing, is somehow relevant. But the indictments for the drive-by shooting were handed down more than a year after the original conspiracy had ended, and nothing shows that the original coconspirators' indictments in some way revived or extended their original conspiracy to "get" the Loves. While the indictments may have been a factor in prompting Holland and Buchanan's entry into a new conspiracy to kill Keys, nothing shows that this new conspiracy included Jones. Again, the only way that liability for Keys's death could be imputed to Jones is if a preponderance of the evidence shows that the original conspiracy to harm the Loves, of which Jones was a member, also included as a reasonably foreseeable goal the slaying of Keys. But no evidence shows that it did.

¶79.    The majority approves of the Court of Appeals' reliance on ***Thompson*** and finds that, because Jones had engaged in violent conduct with respect to the Loves, he reasonably should have foreseen that the members of the conspiracy to harm the Loves would engage in other murderous conduct. ***Thompson*** held that a witness's murder had not been reasonably foreseeable to coconspirators who had not participated in the murder because there was no evidence that the defendants' drug conspiracy previously had perpetrated murder or attempted murder. ***Thompson***, 286 F.3d at 960. The majority finds that, unlike in ***Thompson***, Jones reasonably should have anticipated that his coconspirators would murder a witness because the original conspiracy had involved a murder. But that analysis neglects the key fact that the original conspiracy to harm the Loves had been completed. It had but one goal, to harm the Loves, and it ended when that goal was accomplished. Moreover, Keys was a member of the original conspiracy. He certainly did not agree to his own death, and there was

34

no evidence that the original conspirators had planned to do away with its members should they turn State's evidence. *Cf.* ***United States v. Adoma***, 781 F. App'x 199, 204 (4th Cir. 2019) (conspirator reasonably should have anticipated witness's murder by the other members of a RICO conspiracy because killing was required for gang membership, he already had committed murder on behalf of the gang, and he likely knew other gang members had worked to silence the witness on his behalf). Considering that the original conspiracy was not ongoing and had a single purpose, to "get" the Loves, the killing of one of the original coconspirators for turning State's evidence a year and a half later was not "reasonably foreseeable as a necessary or natural consequence of an ongoing conspiracy." ***Cherry***, 217 F.3d at 820. Although Jones knew that Keys had given a statement to the police, no evidence was adduced that he reasonably should have foreseen that Holland and Buchanan would take the drastic step of killing him. The evidence was insufficient to establish by a preponderance that by wrongdoing, Jones had forfeited his right to confrontation of the witnesses against him.

¶80.    What is more, the conspiracy to victimize the Loves was far from an ongoing, sophisticated criminal enterprise such as a drug-dealing ring, a gang with a reputation for silencing witnesses violently, or a racketeering operation. In fact, no level of organization was shown. Therefore, this case stands in stark contrast to ***Cherry***, ***Thompson***, and other cases that considered the imputation of liability to a coconspirator for procuring a witness's absence. ***Cherry***, 217 F.3d at 813 (drug conspiracy); ***Thompson***, 286 F.3d at 956 ("large, Indianapolis-based drug conspiracy" that "reigned from 1992 to 1997," involving trafficking

hundreds of kilos of cocaine, money laundering, and two business pursuits); *United States*

*v. Dinkins*, 691 F.3d 358, 363 (4th Cir. 2012) (large-scale drug dealing operation that

"committed numerous acts of violence in furtherance of their narcotics activities"); *United*

*States v. Carson*, 455 F.3d 336, 339 (D.C. Cir. 2006) (racketeering conspiracy involving

violent, "organized and massive business of selling drugs"). Because there was no ongoing

conspiracy, this case is not analogous to *Thompson* and the other cases that applied *Cherry*.

The majority applies case law designed for sophisticated criminal enterprises with

overarching criminal aims to a single-goal conspiracy so underdeveloped that the State did

not see fit to charge any of its participants with conspiracy.

> E.      *The Court of Appeals' decision conflicts with **McClung v. State**, 294*
>         *So. 3d 1216 (Miss. Ct. App. 2019).*

¶81.    Another problem is that the Court of Appeals' decision, which the majority affirms,

conflicts with its decision in *McClung*. In McClung's case, the Court of Appeals applied the

*Cherry* test and found that the forfeiture by wrongdoing exception did not apply to McClung

and, therefore, Keys's statement should not have been admitted against him. *McClung*, 294

So. 3d at 1230. But the evidence on forfeiture by wrongdoing was not distinguishable in any

material way from the evidence against Jones. *McClung* held that:

> [W]e find that the State did not present sufficient evidence that McClung
> conspired with any other defendant to kill Keys or that Keys's death was
> foreseeable to McClung. To the extent that McClung was a part of the shooting
> incident, the State made no showing that any conspiracy to do so, and
> involving McClung, continued as far as McClung's involvement or
> acquiescence in killing Keys. *See Thompson*, 286 F.3d at 965 ("By limiting
> coconspirator waiver-by-misconduct to those acts that were reasonably
> foreseeable to each individual defendant, the [conspiratorial responsibility]
> rule captures only those conspirators that actually acquiesced either explicitly

36

or implicitly to the misconduct."). Sergeant Bankston testified that McClung was not present the night Keys was killed, nor was McClung developed as a suspect in the Keys murder. Indeed, Keys's murder occurred one and a half years after the shooting and from the time when Keys gave his statement. There also is no evidence in the record of any communication between McClung and Holland or McClung and Buchanan (both suspects in Keys's killing)—either before or after Keys was shot.

Based upon our de novo review of the record and the applicable law, we conclude that the trial court erred in admitting Keys's statement against McClung based upon the forfeiture-by-wrongdoing doctrine.

*Id.* (alteration in original).

¶82. Like McClung, Jones was part of the original conspiracy against the Loves. As in *McClung*, Jones's attorney had been informed that Keys had given a statement that inculpated him in the drive-by shooting. As in *McClung*, no evidence was adduced that Jones had helped plan or execute the slaying of Keys. The only difference in the forfeiture by wrongdoing evidence against McClung versus that against Jones was the additional fact that, after Keys was killed, Buchanan texted Holland from jail using Jones's cell phone. But that additional fact was immaterial. Jones and Buchanan were members of the original conspiracy, so of course they knew each other. The text Buchanan sent to Holland on Jones's cell phone did not concern the slaying of Keys. The fact that Buchanan sent a text message from jail to Buchanan using Jones's cell phone saying, "hey, this is Sed" does not increase the likelihood that Keys's slaying should have been reasonably foreseeable to Jones as part of the original conspiracy. To contend otherwise has no basis in logic. Rather, as the Court of Appeals held regarding McClung, "[t]o the extent that [Jones] was a part of the shooting incident, the State made no showing that any conspiracy to do so, and involving [Jones],

37

continued as far as [Jones]'s involvement or acquiescence in killing Keys." *Id.* One of this Court's roles in *certiorari* cases is to resolve conflicts in the decisions of the Court of Appeals; but the majority's decision ratifies, rather than resolves, the conflict between *Jones* and *McClung*.[13]

F.     Harmless Error

¶83.    Because any error in admitting Keys's statement against Jones was harmless, this Court has no reason at this time to explore the contours of the forfeiture by wrongdoing exception to the state and federal confrontation rights. Violations of the confrontation clause "are subject to harmless-error analysis." *Conners*, 92 So. 3d at 684 (citing *Corbin v. State*, 74 So. 3d 333, 338 (Miss. 2011)). This Court will affirm when, after reviewing the entire record, we can confidently find that "the constitutional error was harmless beyond a reasonable doubt." *Id.* (internal quotation mark omitted) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986)). "Harmless errors are those 'which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction.'" *Id.* (quoting *Chapman v. California*, 386 U.S. 18, 22, 87 S. Ct. 824, 827, 17 L. Ed. 2d 705 (1967)).

---

[13] The majority attempts to distinguish *McClung* because the evidence that McClung was part of the original conspiracy to "get" the Loves was weak. But the Court of Appeals did not distinguish the cases on that ground. Instead, the Court of Appeals found that McClung (like Jones) had been a member of the original conspiracy against the Loves. *McClung*, 294 So. 3d at 1230. But unlike in this case, the Court of Appeals found that liability for Keys's death could not be imputed to McClung because the State had not shown that Keys's slaying was reasonably foreseeable to him. *Id.* I find its reasons for doing so indistinguishable from this case.

¶84.   As the majority sets forth, two surviving victims of the drive-by shooting, Perez Love and Stigler, testified that they watched Jones repeatedly fire his AK-47 upon them. Additionally, Perez Love's girlfriend, Jasmine Cage, testified that she had been following the red Pontiac in an effort to prevent her boyfriend from going to the club when she saw a Tahoe pass her car. Just after it passed her, she saw "sparks like fire." In a statement to law enforcement officers, Cage said that she had seen Jones, Keys, and Holland in the vehicle and that Jones and Holland were on the passenger's side. Shell casings consistent with the AK-47 fired by Jones were found at the scene. Shell casings from Holland's .40 caliber pistol were recovered from the scene, and a bullet fired from Holland's pistol was recovered from Perez Love's head. In light of the overwhelming evidence against Jones, the admission of Keys's statement, which was largely cumulative of the testimony of Perez Love and Stigler, was harmless beyond a reasonable doubt.[14]

### G.   Conclusion

¶85.   The majority plucks the *Cherry* test from the vast expanse of federal criminal law and decides it is appropriate for determining forfeiture by wrongdoing questions in our state. But because *Cherry* was decided before the United States Supreme Court's landmark decisions in *Crawford* and *Giles*, its viability is doubtful. Furthermore, the majority applies *Cherry* in an extremely broad manner, ignoring the fact that this Court may afford additional

---

[14] The majority finds that the evidence was sufficient to support Jones's convictions even without Keys's statement. But the constitutional standard for the erroneous admission of evidence in violation of the Confrontation Clause is not whether the evidence was sufficient to sustain the convictions even without the erroneously admitted evidence, but whether the error in admitting the evidence was harmless beyond a reasonable doubt. *Conners*, 92 So. 3d at 684.

39

protections to defendants under the Mississippi Constitution than are bestowed by the federal constitution. Even applying *Cherry*, Keys's statement was inadmissible because Keys's homicide was not within the scope of the original conspiracy, in furtherance of the original conspiracy, or reasonably foreseeable as a necessary or natural consequence of an ongoing conspiracy. Because the admission of Keys's statement against Jones was harmless error, I would avoid the *Cherry* morass and affirm the decision of the Court of Appeals as to Jones on other grounds. I agree with the majority's decision to reverse and render a judgment of acquittal as to Buchanan.

**KING, P.J., JOINS THIS OPINION. ISHEE, J., JOINS THIS OPINION IN PART.**